**Maurice A. MASON, Petitioner,**

v.

**Betty MITCHELL, Warden,
Respondent.**

No. 1:99 CV 524.

United States District Court,
N.D. Ohio,
Western Division.

May 9, 2000.

David C. Stebbins, Columbus, Patricia A. Snyder, Cleveland, OH, for Maurice A. Mason, petitioners.

Stuart A. Cole, Office of Attorney General, Matthew J. Lampke, Office of Attorney General, Employment Law Section, Matthew C. Hellman, Office of Attorney General, Capital Crimes Section, Columbus, OH, for Betty Mitchell, Warden, respondents.

## MEMORANDUM OPINION

KATZ, District Judge.

This matter is before the Court on Petitioner's motion for a writ of habeas corpus and corrected motion for a writ of habeas corpus (Doc. Nos. 22 & 25); the State's motion to strike Petitioner's traverse (Doc. No. 67); and on Petitioner's motion for an evidentiary hearing (Doc. No. 70). For the following reasons, Petitioner's motion for a writ of habeas corpus will be denied. The State's motion to strike will be denied. Petitioner's motion for an evidentiary hearing will be denied.

### BACKGROUND

In February, 1993, Petitioner Maurice Mason, an African–American man, was a resident of Marion, Ohio. Decedent Robin Dennis, a white woman, was a resident of Richwood, Ohio, and was acquainted with Mason. Dennis was last seen alive on February 8, 1993. On February 15, 1993, Dennis' body was found in an abandoned building in a rural area north of Marion, Ohio. The coroner determined that she had died several days earlier as a result of blunt force trauma causing multiple skull fractures. The probable weapon, a blood-stained board with protruding nails, was found twenty feet from Dennis' body.

Evidence that Dennis had been raped was also found at the scene. When Dennis' body was discovered, she was wearing only a bra; her jeans and panties were positioned around her ankles and lower leg. She had been strangled, and there were bruises on her head, face, and body. Inside and around Dennis' car, which was found near the murder site, forensic investigators discovered Nike tennis shoe impressions and type B blood, Dennis' blood type; the location of the tennis shoe marks and the blood were consistent with a struggle having taken place inside and around the car. Semen was found in Dennis' vagina and on her panties; DNA testing determined that the semen was Mason's.

Two witnesses saw a person fitting Mason's description walking in the area of the murder site between 4:10 and 4:15 p.m. on the day Dennis disappeared. Police found Mason's car keys on the front seat of Dennis' car. Type B blood was found on the side of a Nike [1] tennis shoe Mason was wearing on February 12, 1993.

Petitioner Mason was charged with the rape and aggravated murder of Robin Dennis. The case was tried to a jury between May 31, and June 29, 1994. The jury convicted Mason and recommended imposition of the death penalty. On July 7, 1994, the trial court adopted the jury's recommendation that Mason be sentenced

---

1. Dennis had also been wearing Nike tennis shoes at the time of the murder. Forensic investigators were not able to determine whether the shoes Mason was wearing matched the shoe marks found in and around Dennis' car.

to death. The conviction and sentence were upheld on direct appeal.[2] On July 15, 1999, Petitioner filed this petition for a writ of habeas corpus, challenging both his conviction and sentence. He raises the following twenty-five challenges to the proceedings in the trial court and on appeal:

1. Petitioner claims he was denied his right to investigative and expert assistance in preparing and presenting his defense because the trial court refused to authorize the expenditure of funds for experts in the areas of: soil analysis; shoe print analysis; blood analysis; DNA analysis; the reliability of eyewitness identification; homicide investigation; mass media; and mental health. He further argues that the Supreme Court of Ohio used a too-deferential standard in its review of the trial court's denial of Petitioner's requests for the aforementioned experts.

2. Petitioner raises a claim of ineffective assistance of counsel arising out of counsel's preparation of the motions for expert assistance; preparation of Petitioner's motions to suppress; the amount of time Petitioner's counsel spent preparing for the trial; the trial court's denial of Petitioner's request for a continuance; counsel's performance during the jury selection process; counsel's performance during the guilt/innocence phase of the case; counsel's failure to present mitigation evidence during the penalty phase of the case; lead counsel's absence from the courtroom during portions of the case; failure to object to an *Allen* charge; and failure properly to present a motion for a new trial. He also claims that his appellate counsel's performance was deficient because appellate counsel either (a) failed on appeal to present his complaints arising out of the trial, or (b) improperly defaulted such claims by failing to address them on appeal.

3. Petitioner claims that the State improperly failed to disclose *Brady* material.

4. Petitioner claims that the Ohio Supreme Court erred by deferring to the jury and trial court's determination that the death penalty was proper in this case.

5. Petitioner claims that the imposition of the death penalty was improper because the state was allowed to give the first and last arguments during the mitigation phase closing arguments.

6. Petitioner claims that the imposition of the death penalty by electrocution constitutes cruel and unusual punishment in all cases.

7. Petitioner claims that the imposition of the death penalty constitutes an unconstitutional violation of international law in all cases.

8. Petitioner claims that Ohio's statutory requirement that the defendant prove the existence of mitigating factors in the penalty phase is unconstitutional.

9. Petitioner claims that it was impossible for him to get a fair trial in the venue in which he was tried because of pretrial publicity.

10. Petitioner claims that his conviction and sentence were unconstitutional because his trial was infested with racial discrimination.

11. Petitioner claims that inculpatory statements he made to police officers were improperly introduced during trial in violation of his Fourth Amendment rights.

12. Petitioner claims that he was denied his right to trial by a fair and

---

**2.** *See Ohio v. Mason,* 82 Ohio St.3d 144, 694 N.E.2d 932 (1998), *aff'g* 1997 WL 317431 (Ohio Ct.App. June 6, 1997); 1996 WL 715479 (Ohio Ct.App. Dec.9, 1996); 1996 WL 715480 (Ohio Ct.App. Dec.9, 1996).

impartial jury because the trial court improperly limited counsel's investigation into jurors' attitudes about race; because the trial court inappropriately expressed his personal view on the death penalty; because the prosecutor repeatedly referred to the first phase of Petitioner's trial as the "guilt" phase; because counsel failed to question two jurors who were victims of domestic violence in detail about that issue; and because counsel failed to examine potential jurors about their feelings about the victim being pregnant at the time of her death.

13. Petitioner claims that he was denied his right to trial by a fair and impartial jury because the prosecution (a) successfully challenged for cause all potential jurors who stated that their beliefs about the death penalty would prevent them from fairly considering death as a penalty, and (b) used its peremptory challenges to remove three potential jurors who expressed scruples about the death penalty.

14. Petitioner claims that he was denied due process because of the admission into evidence of inflammatory color photographs of the murder victim. He claims that the prejudicial impact of those photographs outweighed their probative value.

15. Petitioner claims that the jury was provided with transcripts of statements Petitioner made to the police, and that those statement were transcribed in such a manner as to suggest racial stereotypes.

16. Petitioner claims that the trial court inappropriately prevented him from presenting evidence that the victim's husband had a history of violence in order to show that the murder had, in fact, been committed by the victim's husband.

17. Petitioner claims that the prosecutor engaged in prosecutorial misconduct, and that the trial court improperly failed to give a curative instruction.

18. Petitioner claims that the trial court erred by instructing the jury that it must determine that Petitioner was not guilty of the greater charge of aggravated murder before considering the lesser charge of murder brought against Petitioner.

19. Petitioner claims that the prosecution failed to present evidence from which a reasonable jury could find all the elements of aggravated murder beyond a reasonable doubt.

20. Petitioner claims that the trial court's instructions at the penalty phase of the trial were improper.

21. Petitioner claims that he was denied his right to a trial free of racial bias because the only African–American venireperson was successfully challenged for cause after he stated that he could not vote for the death penalty, and because some of the jurors made racially derogatory remarks while they were sequestered and during deliberations.

22. Petitioner claims that the trial court gave an improper *Allen* charge during jury deliberations at the penalty phase of the trial.

23. Petitioner claims that imposition of the death penalty in this case is so disproportionate to the offense as to violate the Eighth Amendment.

24. Petitioner claims the trial court improperly rejected his allegations of juror misconduct—namely, racial bias by several jurors, sleeping by Juror Straub, and an improper investigation by Juror Downs.

25. Petitioner claims that Ohio's death penalty statute is facially unconstitutional.

Respondent filed her return of writ on September 2, 1999. Thereafter, Petitioner requested and was granted numerous extensions of time in which to file his traverse; the final such extension made Petitioner's traverse due on January 7, 2000.

Petitioner filed his traverse on January 18, 2000, without seeking leave for a further extension of time. Respondent has moved the Court to strike Petitioner's traverse as untimely filed. Petitioner responds that he was delayed because counsel encountered numerous technical difficulties with his computer.

In addition, Petitioner has filed a motion for an evidentiary hearing on his claims numbered 1, 2, 6, 10, 12, 21, 23, and 24. The State has filed opposition to that motion.

The Court discusses the parties' contentions below.

## MOTION TO STRIKE PETITIONER'S TRAVERSE

Respondent has moved to strike Petitioner's traverse as untimely. The Court agrees with Respondent—and Petitioner admits—that it was improper for Petitioner to file his traverse late without leave of Court, especially in light of the number of extensions Petitioner was given. However, in light of the seriousness of the penalty Petitioner faces, the Court finds it proper to consider the arguments contained in Petitioner's traverse.

Accordingly, the Court will consider the parties' arguments on their merits. The Court has reorganized Petitioner's arguments into six separate categories, and will consider them in somewhat chronological order. The Court will address Petitioner's request for an evidentiary hearing as it addresses Petitioner's arguments on the merits.

## MOTIONS FOR HABEAS CORPUS AND FOR EVIDENTIARY HEARING

Petitioner has filed his motion for a writ of habeas corpus under 28 U.S.C. § 2254, which permits a prisoner in state custody to challenge his incarceration "on the ground that he is in custody in violation of the Constitution or law or treaties of the United States." Petitioner raises numerous challenges to his conviction and sentence.

### A. Claims Arising out of State's Pretrial Conduct

### 1. Fourth Amendment Violation Arising out of Police Interrogation

The first chronologically occurring event about which Petitioner complains appears in claim number eleven of his petition. Petitioner claims that the police improperly interrogated him in violation of his Fourth Amendment rights, and that inculpatory statements he made during that interrogation were improperly admitted at trial in violation of *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

At the hearing on Mason's motion to suppress the statements he made during the two challenged interrogations, the evidence showed that Petitioner was first interrogated on February 10, 1993, two days after the victim disappeared, and five days before her body was discovered. The first interrogation was conducted at the police station, was tape recorded, and lasted eighteen minutes. Both Petitioner Mason and Detective Dennis Potts testified that Mason voluntarily accompanied Potts to the police station, that Mason was never told he could not leave, and that Potts drove Mason back to his home after the interview.

The second interrogation took place on February 12, 1993, and lasted approximately four hours. Both Mason and Potts testified that Mason voluntarily accompanied Potts to the police station, and that Mason was not formally arrested or told

he could not leave at any time during the interview. Mason's parole officer, Doug Schiefer, observed the February 12, 1993 interview through a one-way mirror and determined, on the basis of information adduced during that interview, that Mason should be arrested for parole violations including alcohol consumption and associating with known felons.

Half an hour after the interview ended, Schiefer arrested Mason for violation of his parole. Mason was given his *Miranda* warnings at that time, refused to waive his rights, and the interview concluded.

There seems to be no dispute that Mason was a suspect at the time of both interrogations.

There also seems to be no dispute that Mason was not arrested until *after* the second interview had concluded, and could have left prior to that time. During the second interview, Mason asked several times whether he was under arrest, and was repeatedly assured that he was not. Mason himself testified as follows at the hearing on his motion to suppress:

Q Now, basically what happened is that on February 10th, that's the first time you talked to Detective Potts. You didn't believe at all that they thought you had anything to do with this crime, did you?

A I didn't, no, sir.

Q And so you agreed to cooperate with 'em?

A Um-hum.

Q And that was a voluntary choice on your part, wasn't it?

A Right.

Q And on February 12th when Detective Potts came to your house, you still didn't believe that they thought you had anything to do with this case?

A Why should I?

Q And so you made a voluntary choice to cooperate with them?

A Yes, I did.

Q And that really was your opinion throughout the entire interview on the 12th, until the very end when they started turning up the heat in the interview, and then what you say pointing the fingers at you, isn't that what happened?

A Basically, yeah.

. . . . .

Q And when they came in and read you your rights—they came in and read you your rights, and you said, "so what? I'm under arrest or something?" That's what you said at 4:03, isn't it?

A Um-hum.

Q Because that's the first time that you understood that you were going to be placed under arrest, isn't it?

A Right.

Q And prior to that, you were never placed under arrest, were you?

A Hum-um.

■ The issue before the trial court at the motion to suppress, and the issue before this Court, is whether Petitioner was "in custody" for purposes of the Fourth Amendment at the time of the two interrogations, so as to trigger his right to *Miranda* warnings. If Petitioner was "in custody," the police officers who interviewed him violated his rights, and the inculpatory statements he made during those interviews should not have been admitted into evidence. If Petitioner was not "in custody," his right to *Miranda* warnings was not triggered, and it was proper to admit Petitioner's inculpatory statements. *See Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612.

■ An individual is "in custody" only where there has been a "formal arrest or restraint on freedom .of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). The only relevant inquiry is how a reasonable person in the suspect's position would have understood the situation. A police officer's undisclosed view that the

individual under questioning is a suspect is not relevant to the question of whether that individual is in custody. *Stansbury v. California,* 511 U.S. 318, 324, 114 S.Ct. 1526, 1529–30, 128 L.Ed.2d 293 (1994).

The trial court found that Petitioner was not in custody on the basis of Petitioner's testimony that he voluntarily accompanied the police to the police station for questioning, and that he understood he was not under arrest at the time of the interrogations. Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the trial court's factual determination that Petitioner understood he was not under arrest at the time of the interrogations is presumed to be correct unless the petitioner rebuts it by clear and convincing evidence.[3] 28 U.S.C. § 2254(e)(1).

Petitioner has not attempted to rebut the trial court's factual determination on that issue. Nor could he, since the trial court based its determination on Petitioner's own testimony that he believed he was not a suspect and understood he was not under arrest at the time of the interrogations.

Notwithstanding his own testimony that he understood he was not under arrest and that there was no formal restraint on his movement, Petitioner argues that he was in custody at the time of the two interrogations, because the interrogations occurred at the police station and because he was a suspect in the case.

▮▮▮ Petitioner misstates the law. The fact that an individual is a suspect in a criminal case is not relevant to the issue of whether he is in custody for *Miranda* purposes, as long as the police *do not convey*

to the individual that he is a suspect. *Stansbury,* 511 U.S. at 324, 114 S.Ct. at 1529–30. Nor is the fact that the interrogation occurred at the police station dispositive of the issue, because "some suspects are free to come and go until the police decide to make an arrest." *Id.* at 325, 114 S.Ct. at 1530.

There is no dispute in this case the Petitioner believed both that he was not a suspect, and that he was not under arrest, until the police formally arrested him half an hour after his second interrogation concluded. There is no dispute in this case that the actual decision to arrest did not occur until the time when the second interrogation concluded. These undisputed facts compel a finding that Petitioner was not in custody at the time of the two interrogations. Therefore, *Miranda* warnings were not required, and admission of his statements at trial was proper.

Petitioner's eleventh challenge to his conviction and sentence is meritless.

### 2. *Failure to Disclose Brady Material*

▮▮▮ In claim number three, Petitioner alleges that the State improperly failed to supply him with three pieces of exculpatory evidence, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* requires the prosecution to provide an accused with all evidence favorable to him, "where the evidence is material either to guilt or to punishment." *Id.* at 87, 83 S.Ct. at 1196–97. The duty to disclose encompasses impeachment evidence as well as exculpatory evidence. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

---

3. Petitioner has argued that the AEDPA does not govern this case, because his trial and conviction occurred before AEDPA's effective date of April 24, 1996. That argument lacks merit. The provisions of AEDPA that are codified in 28 U.S.C. § 2254 apply to all habeas corpus proceedings that are filed on or after April 24, 1996. *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *accord Terry Williams v. Taylor,* —

U.S. ——, 120 S.Ct. 1495, 146 L.Ed.2d 435 (2000); *Michael Williams v. Taylor,* — U.S. ——, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). The relevant date is the filing of the habeas petition, not the date of conviction. *See Calderon v. United States Dist. Ct. Cent. Dist. Cal.,* 128 F.3d 1283, 1287 n. 3 (1997); *Nobles v. Johnson,* 127 F.3d 409, 413–15 (5th Cir.1997); *Holman v. Gilmore,* 126 F.3d 876, 879–80 (7th Cir.1997).

■ Petitioner did not raise this claim on direct appeal from his conviction. Thus, the claim is procedurally defaulted unless Petitioner can establish cause for his failure to raise it and prejudice attributable thereto, *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506–2507, 53 L.Ed.2d 594 (1977), or that the constitutional error probably led to the conviction of an innocent person, *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649–50, 91 L.Ed.2d 397 (1986).

■ Petitioner does not dispute that he did not raise his *Brady* claim on direct appeal. He argues, however, that the Court should not find his *Brady* claim to be procedurally defaulted because the claim arises out of governmental misconduct. That argument lacks merit. It is well established that a habeas petitioner who fails to raise a *Brady* claim on direct appeal cannot bring such a claim in a collateral attack on his conviction and/or sentence without a demonstration of both cause and prejudice. *Gray v. Netherland*, 518 U.S. 152, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996).

■ With regard to cause and prejudice, Petitioner argues summarily that he "has cause for not earlier presenting this issue in state court. Mason has been prejudiced thereby because he lost an opportunity for federal review of a claim of merit." (Pet'r's Traverse at 100.) He makes no factual arguments to support either proposition. He has identified no basis to support a finding of cause for his failure to raise his *Brady* arguments on direct appeal. Nor has he demonstrated that the exculpatory evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 1952, 144 L.Ed.2d 286 (1999). Accordingly, the Court finds that Petitioner has procedurally defaulted his *Brady* claim.

■ Furthermore, the Court has conducted an independent review of the materials Petitioner has submitted, and has determined that none of those materials would compel a finding of a *Brady* violation, even were this Court to consider Petitioner's *Brady* claim on the merits. In order to make out a true *Brady* violation, a petitioner must show not only that the state failed to disclose exculpatory evidence, but that "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 119 S.Ct. at 1948.

■ Petitioner first indicates that four days after Dennis' body was found, Robert Rodeffer stated that he had been present at Dennis' murder, and gave information about it. The Court has reviewed the contemporaneous reports of Rodeffer's statement. Those reports indicate that Rodeffer was both heavily intoxicated and suicidal at the time,[4] and that he made those statements as part of an evaluation that was being conducted at Marion General Hospital. Both the reports of Rodeffer's conduct and the content of the assertions Rodeffer made indicate the presence of serious mental health problems. The factual statements Rodeffer made about the cause of death were inconsistent with Dennis' physical injuries.

On these facts, it strains credibility past the breaking point to suggest that there is a reasonable probability Rodeffer's evidence would have produced a different verdict. It is not at all unusual, after a murder has received widespread media attention, for mentally unstable people to come forward with "information" about the killing that ultimately proves to be inconsistent with the actual facts of the case. Even a cursory review of Rodeffer's conduct on the night he made his statement, and the content of the statement itself,

---

**4.** Rodeffer apparently had consumed at least ⅞ of a fifth bottle of whiskey and seven sleeping pills. He attempted to hang himself with

a bedsheet a few days after making his statement.

reveals Rodeffer to be one of those people. The state's failure to disclose Rodeffer's statement does not create a *Brady* violation.

 Petitioner next indicates that the state failed to disclose the existence of two separate telephone conversations Captain Al Hayden had with Dennis' friends Michael and Carolyn Young three days before the jury was impaneled. The evidence adduced at trial showed that Robin Dennis and her husband Chris had spent the night of February 7–8, 1993 at the Youngs' home after a party at which significant amounts of alcohol were consumed. The morning of February 8, 1993, the day Robin Dennis disappeared, Petitioner Mason and his wife joined the group. Evidence adduced at the trial showed that Robin Dennis and Petitioner had left the Youngs' house together at about 2:30 that afternoon. Chris Dennis was lying under the coffee table, passed out, from before the time Robin Dennis and Petitioner left the house until between 6:00 and 10:00 that evening.

During Hayden's conversations with the Youngs, both Michael and Carolyn Young indicated that they had moved from Ohio to South Carolina because they were receiving threatening letters and telephone calls from unknown people in connection with the trial. Michael Young told Captain Hayden that when Chris Dennis woke up late in the evening on February 8, 1993, he was angry that Robin Dennis was not there, and said he would kill her when he found her. Carolyn Young said she thought she had seen, several hours after Dennis was last seen alive, the Harley–Davidson T-shirt Dennis was wearing at the time of the murder. Carolyn Young said she thought she had seen Robin Dennis riding in a car on the evening of February 8, 1993, several hours after the prosecution argued that Petitioner killed Dennis. Both Youngs expressed concerns that Chris Dennis might have killed his wife in order to gain the proceeds of her life insurance. Petitioner claims that he was entitled to disclosure of those statements, because they tend to support his defense that Chris Dennis was the real murderer.

The Court has reviewed the record. Both Michael and Carolyn Young testified at trial. Michael Young testified on direct examination that Chris Dennis (decedent's husband) had said "If I find her, I'll kill her" on the night of February 8, 1993. (Tr. at 2442, line 17–18.)[5] Petitioner had ample opportunity to cross-examine Michael Young as to that statement, and did so cross-examine him. (Tr. at 2477–78.)

Carolyn Young testified on direct examination that Chris Dennis showed her a black Harley–Davidson T-shirt a few hours after Robin Dennis disappeared. (Tr. at 2601–03.) She also testified that Robin and Chris Dennis owned at least two Harley Davidson T-shirts,[6] and that the T-shirt Chris Dennis showed her was not the same T-shirt found near the victim's body. (Tr. at 2604–05.) Petitioner had ample opportunity to cross-examine Carolyn Young about that testimony, and did so cross-examine her. (Tr. at 2684–86.)

Carolyn Young also testified on direct examination that she thought she saw the victim alive at about 9:45 on the evening of February 8, 1993. (Tr. at 2606–10.) Upon further examination, she testified that she believed the car was the victim's because it was a beige Skylark with one headlight missing, but that lighting conditions were poor and she was not wearing her glasses, so she was not certain that the individual in the car was Robin Dennis. (Tr. at 2609–10.) Petitioner had ample opportunity to cross-examine Carolyn Young on that issue, and did so cross-examine her. (Tr. at 2677–82.)

---

**5.** Carolyn Young's testimony corroborates that statement. (Tr. at 2676.)

**6.** Other testimony established that Chris and Robin Dennis each owned several Harley Davidson T-shirts. (Tr. at 2718, 3067.)

Carolyn Young's cousin, Melissa Wright, also testified about Carolyn Young's statement that she had seen the victim alive on the evening of February 8, 1993, and was cross-examined in detail about her testimony. (Tr. at 2547–48 & 2566–69.)

Petitioner attempted to elicit testimony from Carolyn Young on cross examination that she believed Chris Dennis had arranged for his wife to be killed for her life insurance money. (Tr. at 2646.) The trial court refused to allow the testimony because Carolyn Young could not identify a factual basis for her belief. Petitioner questioned both Michael and Carolyn Young about Robin Dennis' life insurance policy.

Thus, the record demonstrates conclusively that Petitioner not only had access to, but actually attempted to proffer at trial, every piece of exculpatory evidence he now alleges he was unfairly deprived of by the state's failure to disclose Captain Hayden's telephone conversations with Michael and Carolyn Young. On this record, Petitioner cannot demonstrate a reasonable probability that disclosure of the undisclosed evidence would have produced a different verdict. The state's failure to disclose Captain Hayden's telephone conversations with Michael and Carolyn Young does not create a *Brady* violation.

Finally, Petitioner claims that the state failed to disclose pretrial statements of witnesses Ricky McDuffie, Gregory Bruce Allen Jones, Michael Young, Melissa Wright, Carolyn Young, and Chris Dennis that differ from the statements offered by those witnesses at trial. Petitioner has filed nothing with the Court to indicate that any such documents exist, and the Court's review of the trial transcript demonstrates that Petitioner cross-examined each of the listed witnesses in detail, and frequently used pretrial statements from those witnesses for impeachment purposes. On this record, Petitioner cannot demonstrate a *Brady* violation arising out of the state's failure to provide inconsistent pretrial statements from Ricky McDuffie, Gregory Bruce Allen Jones, Michael Young, Melissa Wright, Carolyn Young, and Chris Dennis.

Petitioner's third challenge to his conviction and sentence is meritless.

### B. Claims Relating to Jury Selection, Conduct, Instructions, and Deliberations

Petitioner has raised a number of challenges to the impartiality of the jury.

#### 1. Failure to Transfer Venue

In claim number nine, Petitioner claims that it was impossible for him to get a fair trial in the venue in which he was tried because the venire was tainted by pretrial publicity. Petitioner moved for a transfer of venue, but did not raise this claim on direct appeal from his conviction. Thus, the claim is procedurally defaulted unless Petitioner can establish cause and prejudice. Petitioner claims that he has shown cause and prejudice because the local media coverage was so extensive that his trial attorney's failure to move for a transfer of venue amounted to ineffective assistance of counsel.

As has already been stated, this case arises out of the rape and murder of Robin Dennis, a white woman, by Petitioner Maurice Mason, an African–American man, on February 8, 1993, near Marion, Ohio. The victim's disappearance and murder were covered in detail by local news media, so that most residents of the area knew something about the crime by the time the case went to trial. The bulk of the media coverage occurred around the time of the victim's disappearance. Petitioner has identified only two newspaper articles appearing after March, 1993, and none after September of that year.

Jury selection began on May 31, 1994. Before conducting voir dire, the trial court had each juror fill out a forty-one question form. The trial court then conducted individual voir dire of each venireperson, out of the presence of the other potential ju-

rors, to determine both the venireperson's views on the death penalty, and whether pretrial publicity had influenced his or her views on Petitioner's guilt.

A handful of venire members were dismissed for cause after they indicated that they had formed opinions about Petitioner's guilt. Most of those venirepersons were personally acquainted with either Petitioner or the victim, or a close friend or relative of Petitioner or the victim. One or two venirepersons indicated that news reports had affected their opinions.

None of the individuals who served on the petit jury claimed any detailed knowledge about the case. The Juror who displayed the most knowledge was Juror Downs. Juror Downs indicated during individual voir dire that she had read a few newspaper articles about the murder the previous year. Upon questioning, she stated that:

> Ms. Downs: I have read, like probably everybody in Marion County; I haven't read maybe as much as—well, maybe I have. I had a couple sisters that was pretty sick last year and died within a week of each other, so I was going back and forth. And a lot of times, I didn't read the paper.
>
> . . . . .
>
> Attorney Slagle: Do you remember any specifics at all?
> Ms. Downs: Other than the girl's body was found and they had picked a—no, I don't think they picked a suspect up. I think a suspect was already incarcerated and, if I remember right, and I think they was waiting on DNA evidence.

(Tr. at 935–36.) No other juror who actually served claimed as much knowledge as Juror Downs. Juror Davis said that he had read an article about the case in the *Marion Star*, but that he considered it an untrustworthy newspaper, and had not formed any feelings about the case. (Tr. at 1014.) Jurors Bird, Furlong, Haines, Haney, Mahaffey, and Straub stated that they were unfamiliar with the case.

After individual voir dire was completed, the trial court conducted general voir dire in the presence of the entire venire. Jurors Crane, Dennis, Gleason, and McGuire were asked during general voir dire whether they had heard anything about the case, and did not indicate that they had heard anything. Every juror who was impaneled stated that he or she could remain impartial and decide the case based only on the evidence presented at trial. The jury was sworn on June 2, 1994.

█ The issue the Court must decide on Petitioner's ninth challenge to his conviction and sentence is whether his appellate counsel's failure to raise the denial of his motion for a transfer of venue was so glaringly deficient that it amounted to ineffective assistance of counsel, and whether he has shown prejudice attributable thereto. If Petitioner cannot show cause and prejudice, his claim is procedurally defaulted.

Furthermore, since Petitioner has not ever argued, and does not now argue, that any particular juror actually revealed a disqualifying animus or unfavorable predisposition toward him during voir dire, his claim must be based on a presumption of prejudice, despite the fact that his trial counsel passed every member of the eventual jury for cause, and the trial court found each juror to be impartial. The trial court's determination that the petit jury was impartial is presumed to be correct unless the petitioner rebuts it by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

█ The facts in the record compel a finding that Petitioner cannot show cause and prejudice for his failure, on appeal, to raise the trial court's denial of his motion for a transfer of venue. Nor would such a claim have merit even were this Court to consider it. Pretrial publicity, in and of itself, does not inevitably lead to an unfair trial. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976). A juror's prior knowl-

edge of the existence of the case, familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint. *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir.1998). The doctrine of presumed prejudice is "rarely invoked and only in extreme situations," where the pretrial publicity is so inflammatory that it has "displaced the judicial process, thereby denying the defendant his constitutional right to a fair trial." *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998).

This case displays none of the circumstances which federal courts have found sufficiently exceptional to merit a presumption of prejudice. No allegation has been made that the newspaper reports of Robin Dennis' disappearance and death were inflammatory. No allegation has been made that the venire as a whole exhibited indications of prejudice against Petitioner; indeed, only a handful of the 125 venirepersons were disqualified because of fixed opinions about Petitioner's guilt. Sixteen months passed between the time of the murder and the time of the trial, and the few venirepersons who stated that they had heard about the case generally indicated that their memories had faded. (*See* Tr. at 1034.) All of the jurors who actually served indicated that they knew little or nothing about the case before the trial. The jury was properly and repeatedly instructed not to read, watch, or listen to any news coverage of the case, or to discuss the trial with anyone, and they were sequestered during their deliberations. On these facts, the Court must defer to the trial court's factual determination that the jury was not unduly tainted by pretrial publicity.

Petitioner's ninth challenge to his conviction and sentence is meritless.

### 2. *Improper Conduct During Individual Voir Dire*

In claim number twelve, Petitioner raises a number of challenges to the conduct of the individual voir dire which, he claims, denied him a trial by a fair and impartial jury. Specifically, Petitioner claims (a) that the trial court improperly limited his voir dire on the issue of race; (b) that the trial court improperly refused to remove venireperson Blake for cause; (c) that the trial court inappropriately made its views on the death penalty known to the trial jury; (d) that the prosecutor inappropriately described the "guilt or innocence" phase of the trial as the "guilt phase" during voir dire; (e) counsel failed to examine two female venirepersons who were domestic violence victims as to that issue; (f) defense counsel inappropriately described some of the mitigation factors Petitioner considered proffering as a "crybaby" defense; and (g) counsel failed to examine the potential jurors about their feelings on the victim being pregnant at the time of her murder.

Petitioner has also moved for an evidentiary hearing on those claims. Under the AEDPA, Petitioner is entitled to an evidentiary hearing only if he can demonstrate he was not at fault in failing to develop the factual basis of his claim in state court proceedings, *Michael Williams v. Taylor*, —— U.S. ——, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000), or that his claim relies on "a factual predicate that could not have been previously discovered through the exercise of due diligence; and the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found [him] guilty of the underlying offense," 28 U.S.C. § 2254(e)(2)(A)(ii) & (B).

Petitioner's claim that he was denied his right to an impartial jury because the trial court improperly limited his voir dire on the issue of race lacks merit. The trial court had each venireperson fill out a forty-one question form that addressed race discrimination, and then spent three days conducting sequestered, individual voir dire of prospective jurors. Each prospective juror was questioned on his or her

attitudes about race and race discrimination. Each prospective juror indicated that he or she would be able to decide the case impartially, and that Petitioner's race would not affect his or her decision in the case. The record does not reveal even a single instance where counsel attempted to ask a venireperson a question about race and was prevented from so doing. Petitioner has failed to demonstrate that he was unable to voir dire prospective jurors about their attitudes concerning race.

 Petitioner's claim that he was denied his right to an impartial jury because the trial court improperly refused to remove venireperson Blake for cause after Mr. Blake indicated that he disapproved of interracial dating also lacks merit. First, it is by no means clear that Mr. Blake should have been excused for cause. Mr. Blake stated that notwithstanding his objections to interracial relationships, he would convict Petitioner only if the prosecution proved all the elements of the charged crimes beyond a reasonable doubt. (Tr. at 801–02.) Second, and more importantly, Petitioner used one of his peremptory challenges to remove Mr. Blake from the panel. A defendant's right to a fair and impartial jury is not denied or impaired when he chooses to use a peremptory challenge to remove a juror who should have been excused for cause. "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988); *accord United States v. Martinez–Salazar*, —— U.S. ——, ———–——, 120 S.Ct. 774, 781–82, 145 L.Ed.2d 792 (2000). Petitioner has not demonstrated that the trial court's refusal to dismiss Mr. Blake for cause resulted in his being tried by an impartial jury.

 Petitioner's claim that he was denied his right to an impartial jury because the trial court inappropriately made its views on the death penalty known to the trial jury lacks merit as well. The following colloquy occurred during individual voir dire of Juror Crane:

> The Court: And what are your views or your thoughts about the death penalty?
>
> Ms. Crane: I think that it should be used, but I don't think it is used often enough. I mean, it seems like people are sentenced to death, and then they don't do anything about it anyhow, so it's not really a deterrent.
>
> The Court: Well, we won't debate that. There's been a lot of them have been executed recently. Not in Ohio, it hasn't been. But I agree with you there.

(Tr. at 964–65.) [7] The Court agrees that it is not proper for a judge to express his own views regarding the death penalty during a capital murder trial. In the context of this case, however, the trial court's isolated comment cannot have tainted the venire so as to deny Petitioner an impartial jury. The statement itself was relatively innocuous. Read in context, the Court is merely agreeing that the death penalty is not a significant deterrent to crime—not expressing a view on the propriety of capital punishment. It is undisputed that eleven of the twelve jurors who served never even heard the statement. From the perspective of the one juror who heard the judge's statement, Ms. Crane, the statement was a single, offhand comment that occurred toward the beginning of a month-long trial, and not as part of any official instruction on the law or the facts of the case; it is unlikely that Ms. Crane remembered the statement beyond the conclusion of opening statements. Furthermore, the trial court properly

---

7. Petitioner also complains that the trial judge told venireperson Kirkpatrick, who was not selected to serve on the jury, that imposition of the death penalty was proper under certain circumstances. (Tr. at 815.) Since that statement was not heard by any juror who actually served, it cannot have contributed to the creation of a biased jury.

cured any taint that might have been created by instructing the jurors to disregard any indication of the trial court's view of the case. Cf. Scott v. Mitchell, 209 F.3d 854, 878 (6th Cir.2000) ("Allegations of jury bias must be viewed with skepticism when the challenged influence occurred before the jurors took their oath to be impartial."). Petitioner has not demonstrated that the trial court's statement deprived him of his right to an impartial jury.

 Petitioner's claim that he was denied his right to an impartial jury because the prosecutor inappropriately described the "guilt or innocence" phase of the trial as the "guilt phase" during the voir dire of three jurors who served lacks merit. The prosecutor's reference to the "guilt phase" was merely a convenient shorthand for the first phase of the trial, and did not create a presumption of guilt.

Petitioner's claim that he was denied his right to an impartial jury because counsel failed to examine two female venirepersons who were domestic violence victims as to that issue lacks merit. The record demonstrates that both jurors who indicated histories of domestic violence were, in fact, questioned about that circumstance to counsel's satisfaction.

 Petitioner's claim that he was denied his right to an impartial jury because defense counsel inappropriately described some of the mitigation factors Petitioner considered proffering as a "crybaby" defense lacks merit. A review of the transcript demonstrates that Petitioner's counsel questioned venirepersons about whether they considered certain mitigation factors to be a "crybaby" defense in order to identify and weed out potential jurors who would be inclined to rule disfavorably to Petitioner. The most effective way of determining whether a venireperson would consider Petitioner's mitigation evidence to be a "crybaby" defense was to ask the question. Indeed, if Petitioner's counsel had failed to inquire into venirepersons' attitudes regarding mitigation evidence, Petitioner might well have raised

that failure as a point of error. Petitioner has not demonstrated that his counsel's reference to a "crybaby" defense deprived him of his right to an unbiased jury.

Petitioner's claim that he was denied his right to an impartial jury because counsel failed to examine the potential jurors about their feelings relative to the victim being pregnant at the time of her murder lacks merit. The record demonstrates that the potential jurors were, in fact, informed that the victim was pregnant at the time of the murder and were examined about their attitudes regarding the victim's pregnancy.

Petitioner's twelfth challenge to his conviction and sentence is meritless. No evidentiary hearing is warranted.

### 3. "Death–Qualification" of Jury

 In claim number thirteen, Petitioner claims that he was denied his right to trial by a fair and impartial jury because the prosecution (a) successfully challenged for cause all potential jurors who stated that their beliefs about the death penalty would prevent them from fairly considering death as a penalty, and (b) used its peremptory challenges to remove three potential jurors who expressed scruples about the death penalty. Both arguments lack merit.

 It is proper to exclude from a jury, for cause, a prospective juror who indicates that he or she would not under any circumstances vote for capital punishment. Morgan v. Illinois, 504 U.S. 719, 728, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992); Lockhart v. McCree, 476 U.S. 162, 173–76, 106 S.Ct. 1758, 1764–67, 90 L.Ed.2d 137 (1986). It is equally permissible for a prosecutor to exercise a peremptory challenge to remove a potential juror who would hesitate to impose the death penalty. Luckett v. Kemna, 203 F.3d 1052, 1054–55 (8th Cir.2000); Gosier v. Welborn, 175 F.3d 504, 509–10 (7th Cir. 1999); Keel v. French, 162 F.3d 263, 271 (4th Cir.1998). The actions of which Peti-

tioner complains do not create a constitutional violation.

Petitioner's thirteenth challenge to his conviction and sentence is meritless.

### 4. *"Acquittal First" Jury Instruction*

■ In claim number eighteen, Petitioner claims that the trial court erred by giving an improper "acquittal first" instruction in violation of *Ohio v. Thomas*, 40 Ohio St.3d 213, 219–20, 533 N.E.2d 286, 292 (1988). An "acquittal first" instruction is an instruction that allows the jury to consider a lesser-included offense only if they find that the government has failed to prove beyond a reasonable doubt a defendant's guilt of the greater offense. In this case, the trial court charged the jury that:

the first count of the indictment returned in this case charges the Defendant, Maurice A. Mason, with the crime of Aggravated Murder. This charge is founded upon Section 2903.01(B) of the Ohio Revised Code which provides in pertinent part as follows:

No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, rape.

Before you can find the Defendant guilty of the crime of Aggravated Murder, as he stands charged in the first count of the indictment, the State of Ohio must prove to each member of this jury, beyond a reasonable doubt, that on or about the 8th day of February, 1993, and in Marion County, Ohio, this Defendant, Maurice A. Mason, purposely caused the death of Robin Dennis while the Defendant was committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, rape.

[The trial court then defined a number of terms relevant to the crime of Aggravated Murder.]

If you find that the State proved beyond a reasonable doubt all the essential elements of the aggravating circumstances contained in the Specification, your finding must be guilty of the Specification.

However, if you find that the State failed to prove any one of the essential elements of aggravated circumstances contained in the Specification, your finding must be not guilty of the Specification to Count 1 of the indictment.

If you find the Defendant not guilty of Aggravated Murder, you will then continue with your deliberations and determine whether or not the State of Ohio proved beyond a reasonable doubt all the essential elements of the lesser crime of Murder.[8]

(Tr. at 4147–51.) Petitioner did not object to the instruction at trial. Thus, the claim is procedurally defaulted unless Petitioner can establish cause and prejudice. Petitioner claims that he has shown cause and prejudice because his trial attorney's failure to object to the instruction amounted to ineffective assistance of counsel.

Petitioner did object to the instruction on direct appeal. Notwithstanding Petitioner's failure to preserve the error below, the Ohio Supreme Court addressed the issue and determined that the instruction given by the trial court did not constitute an improper "acquittal first" instruction. *Ohio v. Mason*, 82 Ohio St.3d 144, 160–61, 694 N.E.2d 932, 951 (1998); *cf. State v. Schultz*, 141 N.H. 101, 677 A.2d 675, 678 (1996); *Missouri v. Wise*, 879 S.W.2d 494, 517 (Mo.1994) (en banc); *State v. Daulton*, 518 N.W.2d 719, 723 (N.D. 1994); *Thomas*, 40 Ohio St.3d at 220–21, 533 N.E.2d at 292–93; *Colorado v. Padilla*, 638 P.2d 15, 17–18 (Colo.1981) (all hold-

---

**8.** The trial court's instruction was taken from the approved Ohio Jury Instructions, §§ 503.01(B) & 503.015(B).

ing similar instructions not to be "acquittal first" instructions).

When a prisoner raises a claim that his jury instructions were constitutionally infirm, the standard the Court applies on habeas review is highly demanding. "[T]he fact the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire,* 502 U.S. 62, 71–72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991). Rather, the sole question on a petition for habeas corpus is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72, 112 S.Ct. at 482.

In this case, the Ohio Supreme Court, which is the final arbiter charged with the interpretation of Ohio law, determined that the challenged jury instruction did not violate Ohio law. Furthermore, even if the instruction had been an "acquittal first" instruction, such instructions do not violate federal due process principles. Indeed, they are approved, and even mandated, in many states. *See, e.g., State v. Abdalaziz,* 248 Conn. 430, 729 A.2d 725, 728 (1999); S*tate v. Gagnon,* 589 N.W.2d 560, 565–66 (N.D.1999); *State v. Mann,* 959 S.W.2d 503, 521 (Tenn.1998); S*tate v. Taylor,* 141 N.H. 89, 677 A.2d 1093, 1097 (1996); *see generally State v. Daulton,* 518

N.W.2d 719, 721 (N.D.1994) and cases cited therein. On these facts, where Petitioner's only claim is that his trial counsel failed to object to a jury instruction that was approved under state law, he cannot show either cause for failing to preserve what would have been a meritless objection, or that his counsel's failure to preserve that objection prejudiced him in any way.

Petitioner's eighteenth challenge to his conviction and sentence is meritless.

### 5. Trial Court's Instructions at Penalty Phase

In claim number twenty, Petitioner claims that the trial court's instructions at the penalty phase of the trial gave the jury inadequate guidance and created an unreliable sentencing determination. The trial court charged the jury as follows:

> The evidence [in the penalty phase] ... [includes all information which is relevant to] ... any mitigating factors including, but not limited to, the nature and circumstances of the offense and the history, character, and background of the Defendant, and any other factors that are relevant to the issue of whether the Defendant should be sentenced to death.[9]

---

**9.** The Ohio pattern jury instruction directs jurors to consider, in addition, mitigating factors including but not limited to:

(1) whether the victim of the offense induced or facilitated it;

(2) whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

(3) whether at the time of committing the offense, the defendant, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

(4) the youth of the defendant;

(5) the defendant's lack of a significant history of prior criminal convictions and delinquency adjudications;

(6) if the defendant was a participant in the offense but not the principal offender, the

degree of the defendant's participation in the offense and the degree of the defendant's participation in the acts that led to the death of the victim; and

(7) any other factors that are relevant to the issue of whether the defendant should be sentenced to death.

Ohio Jury Instructions, § 503.106(A). None of those mitigating factors was relevant to the case at bar. There was no evidence presented that the victim induced the offense, or that Petitioner was under duress or suffered from a mental disorder. Youth was not a mitigating factor, as Petitioner was thirty at the time. Petitioner had a significant history of prior criminal convictions and delinquency adjudications. And Petitioner was the principal offender. Since none of the mitigating factors listed in the pattern jury instructions was involved in the case at bar, the trial court was correct to omit them from the instruction.

The Prosecutor has the burden to prove beyond a reasonable doubt that the aggravating circumstances of which the Defendant was found guilty outweigh the factors in mitigation of imposing the death sentence.

To outweigh means to weigh more than, to be more important than. It is the quality of the evidence that must be given primary consideration by you.

The quality of the evidence may or may not be commensurate with the quantity of the evidence. That is the number of witnesses or exhibits presented in this case. It is the quality or importance of the aggravated circumstances and the quality or importance of the mitigating factors which must be considered.

The existence of mitigating factors does not preclude or prevent the death sentence if the aggravating circumstances outweigh the mitigating factors.

\*　　\*　　\*　　\*　　\*　　\*

You shall recommend the sentence of death if you unanimously, all twelve jurors, find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.

If you do not so find, you shall unanimously, all twelve, recommend either a life sentence with parole eligibility after serving twenty years of imprisonment or a life sentence with parole eligibility after serving thirty years of imprisonment.

(Tr. at 4347–49.) Petitioner raises a number of challenges to the charge.

First, Petitioner objects to the trial court's explanation of the bifurcated trial made at the beginning of voir dire. The trial court explained that the first phase of the trial would determine Petitioner's guilt or innocence, and that the second phase of the trial, if necessary, would determine the penalty. (Tr. at 715–16.) Petitioner complains that the trial court's explanation "failed to give the jury any guidance in determining whether a death sentence would be appropriate." That argument lacks merit. The trial judge's description of the bifurcated trial procedure was correct, and was not part of the formal charge to the jury. The trial court's description of the bifurcated trial procedure at voir dire did not render the jury instructions infirm.

Second, Petitioner argues that the jury instruction that was given relieved the state of its burden to prove each essential element of the crime beyond a reasonable doubt. That contention is factually incorrect. The transcript reveals that the trial court instructed the jury that they must "find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors" before the death penalty could be imposed. (Tr. at 4349.)

Third, Petitioner objects to the trial court's failure to define "mitigating factors" or "mitigation" in the jury instructions. That argument lacks also merit. So long as the sentencer is not precluded from considering any constitutionally relevant evidence, no particular instruction is required, and mitigating factors need not be defined. An instruction directing the jury to consider "all the evidence" is constitutionally sufficient. *Buchanan v. Angelone*, 522 U.S. 269, 118 S.Ct. 757, 761–62, 139 L.Ed.2d 702 (1998).

Fourth, Petitioner objects to the introduction of all of the evidence admitted during the guilt phase of the trial at the penalty phase. He argues generally that some of that evidence was not relevant to the penalty phase, although he has not identified any specific evidence fitting into that category. Petitioner's argument is meritless. It is proper for the jury to consider, during the penalty phase of a capital trial, all evidence concerning the nature and circumstances of the offense. Furthermore, Petitioner invited reconsideration of all guilt phase evidence by arguing residual doubt at sentencing. The admission of that evidence was not error.

768

■ Fifth, Petitioner objects to the trial court's curative instruction that "the Defendant's right to appeal his conviction will not be limited in any way by your imposition of the death sentence," (tr. at 4349), given after Petitioner suggested twice during an unsworn statement to the jury that imposition of the death penalty would impair his appeal rights, (tr. at 4279–80). Petitioner argues that the curative instruction violates the rule of law set forth in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). That argument has no foundation.

In *Caldwell*, the prosecuting attorney had stated in closing argument that the defendant's attorneys "would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision. . . . Your job is reviewable. They know it." 472 U.S. at 325, 105 S.Ct. at 2637. The Supreme Court vacated the jury's imposition of the death penalty in that case, holding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the death sentence rests elsewhere." *Id.* at 328–29, 105 S.Ct. at 2639.

■ The Supreme Court has subsequently explained that *Caldwell* is relevant only to comments that "mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v.. Wainwright*, 477 U.S. 168, 184, n. 15, 106 S.Ct. 2464, 2473, n. 15, 91 L.Ed.2d 144 (1986). "To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Romano v. Oklahoma*, 512 U.S. 1, 8–9, 114 S.Ct. 2004, 2009–10, 129 L.Ed.2d 1 (1994) (quoting *Dugger v. Adams*, 489 U.S. 401, 407, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989)). Nothing in *Caldwell* prohibits a trial court from giving the jury accurate instructions

regarding post-sentencing procedures. *Caldwell*, 472 U.S. at 342, 105 S.Ct. 2633 (O'Connor, J., concurring); *Mapes v. Coyle*, 171 F.3d 408, 414–15 (6th Cir.1999).

The trial court's instruction in the case at bar did not create a *Caldwell* violation. The instruction was a correct statement of the law. It did not mislead the jury regarding its role in the sentencing process. The jury was expressly instructed not to consider the subject of appeal in determining Petitioner's sentence. (Tr. at 4349–50.) No *Caldwell* violation occurred.

Sixth, Petitioner objects to the trial court's references to "aggravating circumstances" in the plural during the penalty phase of the trial, when only one such aggravating circumstance existed. That argument lacks merit. It is clear from the record that only one aggravating circumstance—rape—was brought to the jury's attention. In light of that undisputed fact, it cannot be said that the trial court's slip of the tongue "so infected the entire trial that the resulting conviction violates due process." *McGuire*, 502 U.S. at 72, 112 S.Ct. at 482.

Seventh, Petitioner objects to the trial court's denial of his requested instruction that the jury could consider only the circumstance of rape as an aggravating factor in determining whether or not to impose the death penalty. That argument lacks merit. It is not disputed that no other aggravating circumstances were presented for the jury's consideration.

■ Eighth, Petitioner objects to the trial court's denial of his requested instruction that the jury consider mercy as a factor in determining whether or not to impose the death penalty. That argument is without merit. It is not improper for a trial court to refuse a requested instruction on mercy. *Scott*, 209 F.3d 854, 877; *Mapes*, 171 F.3d at 415–16; *Henderson v. Dugger*, 925 F.2d 1309, 1319 (11th Cir. 1991); *accord United States v. Webster*, 162 F.3d 308, 326–27 (5th Cir.1998); *Davis v. Executive Dir. of Dep't of Corrections*,

100 F.3d 750, 775 (10th Cir.1996). Petitioner and his counsel had ample opportunity to ask for mercy during Petitioner's unsworn statement to the jury and during counsel's closing argument, and did so argue. (Tr. at 4322 & 4336.)

 Ninth, Petitioner objects to the trial court's denial of his requested instruction that the jury consider residual doubt as a factor in determining whether or not to impose the death penalty. That argument lacks merit. It is not improper for a trial court to refuse a requested instruction on residual doubt. *Franklin v. Lynaugh,* 487 U.S. 164, 172–74, 188, 108 S.Ct. 2320, 2327, 2335, 101 L.Ed.2d 155 (1988); *Hooks v. Ward,* 184 F.3d 1206, 1229 (10th Cir.1999). Furthermore, Petitioner's counsel discussed residual doubt at length during closing argument; thus, it is extremely unlikely that the requested instruction, if given, would have had any effect.

Tenth, Petitioner claims that the trial court improperly instructed the jury on all seven mitigating factors in Ohio Rev.Code § 2929.04(B), despite the fact that Petitioner presented evidence on only two of those factors. That contention is factually incorrect. The trial court modified the charge to include reference to only those mitigating factors about which Petitioner presented evidence and the final, "catch-all" category. (Tr. at 4347.)

Eleventh, Petitioner claims that the trial court improperly instructed the jury that its imposition of the death penalty was merely a "recommendation" to the trial court, and was not binding. · He presents no record evidentiary support for that contention,[10] and the Court has been unable to find any support therefor.

Even if Petitioner had presented evidentiary support for his contention, the claim would lack merit. Under Ohio law, a jury's imposition of the death penalty is, technically, a recommendation that is subject to the trial court's independent determination. Ohio Rev.Code § 2929.03(D)(2). It is not error so to instruct the jury. *Scott,* 209 F.3d 854, 876; *Mapes,* 171 F.3d at 414–15.

Petitioner's twentieth challenge to his conviction and sentence is meritless.

### 6. *Juror Racial Bias*

In claim number twenty-one, Petitioner claims that he was denied his right to a trial free of racial bias because (a) the only African–American venireperson was successfully challenged for cause after he stated that he could not vote for the death penalty, and (b) some of the jurors made racially derogatory remarks while they were sequestered and during deliberations.

Petitioner has also moved for an evidentiary hearing on those claims. As stated before, Petitioner is entitled to an evidentiary hearing only if he can demonstrate that his claim relies on "a factual predicate that could not have been previously discovered through the exercise of due diligence; and the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found [him] guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(A)(ii) & (B).

 Petitioner cannot sustain his claim that he was denied his right to a trial free of racial bias because the only African–American venireperson was successfully challenged for cause after he stated that he could not vote for the death penalty.

---

**10.** Petitioner has identified a portion of the individual voir dire of venireperson Lemaster, who was dismissed for cause after he stated that he could not impose a death sentence under any circumstances. Petitioner's counsel, in attempting to rehabilitate Mr. Lemaster, asked whether he would be able to rec-

ommend the death penalty if he knew the judge would have the final decision. Mr. Lemaster indicated that he would not, and was discharged for cause. (Tr. at 897). Since that discussion occurred out of the hearing of the jurors who served, it cannot have affected the verdict.

The jury was selected from Marion County voter lists. There was only one African–American person on the 125–person venire.[11] No allegation has been made of any impropriety in connection with the procedures for selecting the venire; it appears that African–Americans were underrepresented on Petitioner's venire merely as a result of random variation.

During individual voir dire, the only African–American venireman was dismissed for cause after he indicated that he would not be able to recommend imposition of the death penalty under any circumstances. The trial court's voir dire of that venireman was, in relevant part, as follows:

> Mr. Wade: "Well, my views on the death penalty is my religious views. I don't believe in the death penalty."

> . . . . .

> The Court: [I]f I instruct you that the death penalty would be proper in a given situation and the law would provide for it, could you not then sign a verdict and follow the Court's instructions and join with your fellow jurors in signing a verdict?

> Mr. Wade: No, I couldn't sign it, because—

> The Court: You refuse to, regardless of how I instruct you?

> Mr. Wade: Yeah, I don't believe a man has a right to play God. God says, "Thou shalt not kill," and that's how it is.

> The Court: Under any circumstances?

> Mr. Wade: The Bible doesn't say a circumstance. He says "kill." He says, "Thou shalt not kill," period.

(Tr. at 1291.) Since Mr. Wade indicated that he would not under any circumstances

vote for capital punishment, it was proper for the trial court to dismiss him for cause. *McCree*, 476 U.S. at 173–76, 106 S.Ct. at 1764–67.

 Petitioner does not argue that Mr. Wade was not subject to dismissal for cause. He argues, however, that the resultant all-white jury violated his right to be tried by a fair cross section of the community. That argument lacks merit. The fair cross-section principle cannot be used to invalidate the cause dismissal of a prospective juror. *Id.* at 173, 106 S.Ct. at 1764. Nor does it require the petit jury to reflect the composition of the community at large, so long as the venire was selected in a racially neutral manner. *Id.* (citing *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 701–02, 42 L.Ed.2d 690 (1975)). Since Petitioner does not complain that the State's procedure for selecting jurors systematically excluded African–Americans, and since Mr. Wade was undisputedly subject to dismissal for cause, Petitioner cannot validly complain that the fair cross-section requirement was violated.

 Petitioner's claim that he was denied his right to a trial free of racial bias because some of the jurors made racially derogatory remarks while they were sequestered and during deliberations also lacks merit. After the conclusion of deliberations, Juror Haney complained about the conduct of some of the jurors while the jury was sequestered and during deliberations. The trial court conducted a detailed inquiry into Juror Haney's allegations, taking testimony from all twelve jurors.

The trial court's investigation produced the information that Juror Davis had, on two or three occasions, made jokes about Petitioner's habit of wearing a "dew rag," [12] and had imitated Petitioner's style

---

**11.** Marion County's population was estimated to be 4.67% African–American at the time of Petitioner's trial. http://www.census.gov/population/estimates/county/crh/crhoh94.txt.

**12.** The term "dew rag" apparently originated in connection with the New Orleans funeral

parade tradition. It has since been adopted not only into "gangsta" slang, but into the parlance of such diverse groups as bikers, survivalists, and health spa proprietors. It is doubtful that most modern users of the

of speech. Some of the other jurors apparently joined in Davis' behavior. There were also jokes about the amount of beer consumed at a party the Dennises attended the night before the murder. All twelve jurors signed affidavits stating that racism had not influenced their deliberations or their decision. The trial court also questioned several jurors, including Haney, and all stated that they never saw any conduct that would have impaired Petitioner's right to a trial free of racial bias.

The trial court found that the jurors' conduct did not impair Petitioner's ability to receive a fair trial. That factual determination is presumed to be correct unless the petitioner rebuts it by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Petitioner has not done so. Nor has he suggested the existence of newly discovered evidence, that could not have been previously discovered through the exercise of due diligence, that would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found him guilty of murder or imposed the death penalty.

Petitioner's twenty-first challenge to his conviction and sentence is meritless.

7. *Allen Charge*

In claim number twenty-two, Petitioner claims that the trial court gave an improper *Allen*, or "dynamite," charge during jury deliberations at the penalty phase of the trial.

The guilt or innocence phase of the case was tried from June 2 to June 17, 1994. On June 18, 1994, the jury returned a verdict of guilty on all counts charged. The court then took a nine-day recess. The punishment phase of the case was presented to the jury on June 27, 1994.

The jury began its deliberations on June 27, 1994 at 3:50 p.m. Before they left the courtroom, the trial judge instructed them as follows:

phrase are aware of its origins. The term is

As in the last phase, members of the jury, it's getting late in the day, and I'm going to leave it to the jury. I'm going to allow you to deliberate, and let's say about 5 o'clock Mr. McGuire, let the Court know as to whether you would like to deliberate further into the evening or if you think that we'd be better to break tonight. You will be sequestered and come back early tomorrow morning then when you're fresh and commence again.

But I'm going to have you deliberate a while this evening to see how far you might get. I don't want to know the status of your deliberations; I just want to know whether you wish to go further this evening rather than come back tomorrow morning.

(Tr. at 4353–54).

At 5:05 p.m. the jury foreman reported that the jury wished to break for the evening. The following colloquy ensued:

The Court: Mr. McGuire, do you have—do you wish to report to the Court at this time?

Mr. McGuire: I don't think we will be able to reach a decision.

The Court: You won't—it won't pay any dividends to continue then this evening?

Mr. McGuire: That's correct.

The Court: Okay, then, that's fine.... we will bring you in whenever it's convenient in the morning. And after you come in fresh, then you can probably make better progress.

(Tr. at 4354–55.)

The jury returned to the courthouse to continue deliberations at 8:45 a.m. on June 28, 1994. At 2:20 p.m., the jury sent the trial court a note indicating that they were deadlocked. The trial court gave the jury a standard *Allen* charge. After giving the *Allen* charge, the trial court engaged in the following discussion with the jury foreman:

not in common use in northwestern Ohio.

The Court: Is there a possibility, Mr. McGuire, that after an additional period of time you may reach an agreement? And this instruction that I have given you, and considering that with the rest of the instructions?

Mr. McGuire: No.

The Court: Would you wish to return to the jury room and discuss it, this instruction, with the jurors and then return and respond to that question?

Mr. McGuire: Yes.

(Tr. at 4372–73.)

The jury returned to its deliberations. At 8:50 a.m. on June 29, 1994, the jury unanimously returned a determination that Petitioner should be sentenced to death. The trial court polled the jury, and each juror indicated agreement with that sentence. On July 7, 1994, the trial court formally adopted the jury's determination that a sentence of death should be imposed on Petitioner.

Petitioner claims that the trial court erred by directing the jury to return to their deliberations after they twice indicated they were deadlocked. The Court disagrees. First, it is important to point out that the jury did not indicate they were deadlocked *twice;* they indicated they were deadlocked *once,* on June 28, 1994. The jury foreman's June 27, 1994 statement that the jury was unable to reach a decision was merely a request that the jury recess for the evening. The Supreme Court has expressly approved the use of *Allen* charges in capital cases. *Lowenfield v. Phelps,* 484 U.S. 231, 237–39, 108 S.Ct. 546, 551, 98 L.Ed.2d 568 (1988). It is not error for a trial court to give a jury a single *Allen* charge, which is what happened in this case.

Petitioner's twenty-second challenge to his conviction and sentence is meritless.

### 8. *Juror Misconduct*

In claim number twenty-four, Petitioner claims the trial court improperly rejected his allegations of juror misconduct on the basis of a misapplication of Ohio R. Evid. 606(B), which protects the privacy of a jury's deliberations from inquiry. Petitioner has also moved for an evidentiary hearing on this claim.

Ohio Rule of Evidence 606(B) provides that:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented. However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes.

As has been stated, after the jury returned its verdict, Juror Haney complained about the conduct of some of the jurors while the jury was sequestered and during deliberations. All twelve jurors voluntarily submitted affidavits addressing the jurors' conduct during deliberations, without any request from the Court. The trial court then conducted a detailed inquiry into Juror Haney's allegations, which inquiry included live testimony from several jurors. Upon conclusion of the inquiry, the trial court determined that the conduct about which Juror Haney complained did not deprive Petitioner of a fair trial. That factual determination is entitled to a presumption of correctness that can be over-

come only by clear and convincing evidence.

The trial court investigated, and rejected, Juror Haney's allegations concerning juror racial bias as evidenced by the "dew rag" jokes and use of African–American vernacular. This Court has previously addressed Petitioner's claims of juror racial bias and will not do so again at this juncture, except to state that Petitioner's claims in that regard lack merit for the reasons previously given.

The trial court investigated Juror Haney's allegation that Juror Dennis had improperly expressed an opinion concerning Petitioner's guilt prior to the conclusion of the trial. The trial court's investigation produced the information that during a long sidebar conference towards the end of a trial day during the guilt phase of the trial, Juror Dennis muttered "maybe he's pleading guilty," or words to that effect. (Tr. at 4467.) Juror Dennis later testified that he had not formed an opinion at that point. Rather, his comment was "just wishful thinking because it was late in the day and everybody was tired." (Tr. at 4469.)

The trial court found that Dennis' comment did not impair Petitioner's ability to receive a fair trial. That factual determination is presumed to be correct unless the petitioner rebuts it by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Petitioner has not done so. Nor has he suggested the existence of newly discovered evidence, not reasonably discoverable through the exercise of due diligence, that would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found him guilty of murder or imposed the death penalty.

The trial court also investigated, and rejected, Juror Haney's allegation that Juror Straub had slept through portions of the trial. That finding was made partly on the basis of the trial court's own perception that Juror Straub had been awake and attentive throughout the trial, (tr. at 4535), and partly on the basis of Juror Straub's own testimony to that effect. Petitioner has not provided clear and convincing evidence to rebut the trial court's factual determination. Nor has he suggested the existence of newly discovered evidence, not reasonably discoverable through the exercise of due diligence, that would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found him guilty of murder or imposed the death penalty.

The trial court also investigated Juror Haney's allegation that Juror Downs had conducted an improper investigation prior to the conclusion of the trial. The trial court's investigation produced the information that after the prosecution had presented to the jury a disassembled gun found at the murder scene, Juror Downs disassembled her husband's gun. The next day, she told some of the jurors that the wooden handle piece that was presented in the courtroom looked like the one in her husband's gun. All of the jurors testified that Juror Downs' investigation had not influenced their verdict.

The trial court found that Juror Downs' improper investigation had not affected the verdict. Petitioner has not provided clear and convincing evidence to rebut the trial court's factual determination. Nor has he suggested the existence of newly discovered evidence, not reasonably discoverable through the exercise of due diligence, that would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found him guilty of murder or imposed the death penalty.

 Notwithstanding the lack of evidence to rebut the trial court's factual determinations regarding Petitioner's allegations of juror misconduct, Petitioner argues that he should be entitled to an evidentiary hearing on his claims, and that the trial court improperly relied on Rule 606(B) to refuse to permit him to inquire

into the jurors' deliberation process. This Court agrees with Petitioner that the trial court violated Rule 606(B), but not in the way argued by Petitioner. Rather than excluding evidence that should have been admitted, the trial court admitted much evidence that should have been excluded. The trial court's error thus inured to Petitioner's benefit, rather than to his detriment, by giving Petitioner more opportunity than he was entitled to, to show that the verdict was infirm. The testimony the trial court admitted concerning the jurors' "dew rag" jokes and use of African–American vernacular was inadmissible under Rule 606(B), and should not have been considered. The testimony the trial court admitted concerning Juror Downs' investigation was inadmissible under Rule 606(B), and should not have been considered. Even with the extra evidence the trial court considered, Petitioner cannot show that juror misconduct so severely tainted his trial as to render his conviction and sentence infirm.

Petitioner's arguments to the contrary are unconvincing. Petitioner argues that he should have been entitled to inquire further into the jurors' biases as expressed while they were sequestered and during deliberations. However, the controlling rule of evidence, known as the *aliunde* rule, expressly states that evidence of statements made during the course of jury deliberations is not admissible. Ohio R. Evid. 606(B). The *aliunde* rule further states that a juror may testify as to extraneous information and outside influences—which might include Juror Downs' improper investigation—only after some outside evidence, external to the jury itself, has been presented. *Id.* In this case, the only evidence of the jurors' conduct was taken from the jurors themselves. The trial court's refusal to permit Petitioner to inquire further into the jurors' deliberations was proper.

Petitioner's twenty-fourth challenge to his conviction and sentence is meritless. No evidentiary hearing is warranted.

## C. Claims Arising out of Conduct of Trial

### 1. Denial of Expert Assistance

In claim number one, Petitioner asserts he was denied his right to investigative and expert assistance in preparing and presenting his defense because the trial court refused to authorize the expenditure of funds for experts in the areas of: soil analysis; shoe print analysis; blood analysis; DNA analysis; the reliability of eyewitness identification; homicide investigation; mass media; and mental health. He further argues that the Supreme Court of Ohio used a too-deferential standard in its review of the trial court's denial of Petitioner's requests for the aforementioned experts. Petitioner has also moved for an evidentiary hearing on this claim.

In *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the Supreme Court held that an indigent defendant has a right to the expert assistance of a psychiatrist where his sanity at the time of the offense will be a significant factor at trial. Although *Ake* itself does not expressly so hold, federal courts have construed *Ake* generally to require the state to provide an indigent defendant with any expert services that are necessary to present an adequate defense. *United States v. Deering*, 179 F.3d 592, 597 (8th Cir.1999); *Rogers v. Gibson*, 173 F.3d 1278, 1286–87 (10th Cir.1999); *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir.1998). The defendant has the burden of making a particularized showing that such assistance is necessary. The state is not required to provide expert assistance where the defendant offers only undeveloped assertions that the requested assistance would be beneficial. *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985). The Court considers three factors in determining whether Petitioner was constitutionally entitled to the requested assistance: (1) the effect on Petitioner's interest in the accuracy of

the criminal proceeding if the requested assistance is not provided; (2) the burden on the state if the assistance is provided; and (3) the probable value of the assistance sought and the risk of error in the proceeding if such assistance is not provided. *Ake*, 470 U.S. at 77–79, 105 S.Ct. at 1093–94.

■ Petitioner first argues that the trial court erred by refusing to approve funds for a soils expert who would have testified that no soil from the crime scene was found on Petitioner's person, clothing, or shoes after the murder. That argument lacks merit. Petitioner does not dispute that the state never argued that soil from the crime scene was found on Petitioner's person, clothing, or shoes after the murder, and that Petitioner repeatedly made that point during the trial. Since the jury was, in fact, presented with uncontradicted evidence at trial that no soil from the crime scene was found on Petitioner's person, clothing, or shoes, Petitioner has not demonstrated any way in which a soils expert would have affected the accuracy or fairness of his trial.

■ Petitioner next argues that the trial court erred by refusing to approve funds for a shoe print expert who would have testified that the Nike shoe prints in the victim's car could not positively be identified as belonging to Petitioner. That argument lacks merit. Petitioner does not dispute that the state conceded at trial that it could not positively identify the shoe prints as belonging to Petitioner. Furthermore, the shoe prints were relevant for two purposes: (1) to demonstrate that Petitioner was in the victim's car; and (2) to demonstrate that a struggle occurred in the victim's car. As to the first point, Petitioner admits that he was in the victim's car on the date in question. As to the second point, the question of whether the shoe prints belonged to Petitioner or to the victim is irrelevant to the jury's determination that a struggle occurred in the car. Petitioner has not demonstrated any way in which a shoe print expert

would have affected the accuracy or fairness of his trial.

Petitioner next argues that the trial court erred by refusing to approve funds for blood and DNA experts. That argument lacks merit. The record indicates that two DNA experts were available to Petitioner, and performed independent DNA testing at Petitioner's request. Furthermore, Petitioner admits that he engaged in sexual relations with the victim on the date in question, and that the semen found in the victim's panties and vagina is his. Petitioner has not demonstrated any way in which an additional blood or DNA expert would have affected the accuracy or fairness of his trial.

■ Petitioner next argues that the trial court erred by refusing to approve funds for an expert on the issue of the reliability of eyewitness identification. That argument lacks merit. No federal court has ever held that a defendant has a right to an appointed expert on the reliability of eyewitness identification. Indeed, it would not have been error for the trial court to exclude the testimony of an expert on the reliability of eyewitness identification even if Petitioner had engaged such an expert using his own funds. As long as the defendant has an adequate opportunity to cross-examine eyewitnesses, the exclusion of expert testimony on the reliability of eyewitness identification is not error. *Moore v. Tate*, 882 F.2d 1107, 1110–11 (6th Cir.1989); *accord United States v. Hall*, 165 F.3d 1095, 1103 (7th Cir.1999); *United States v. Harris*, 995 F.2d 532, 533 (4th Cir.1993). Furthermore, the record indicates that Petitioner did, in fact, present the testimony of an expert on the reliability of eyewitness identification. (Tr. at 3193–3234.) Petitioner has not demonstrated any way in which an appointed expert on the reliability of eyewitness identification would have affected the accuracy or fairness of his trial.

Petitioner next argues that the trial court erred by refusing to approve funds

for a homicide investigation expert to advise counsel about the proper protocol to be followed in homicide investigations. That argument lacks merit. The trial court did, in fact, authorize funds for an expert investigator. Petitioner presented at trial all admissible evidence relating to his theory that the murder was committed by someone else. He has not demonstrated any way in which a homicide investigation expert would have affected the accuracy or fairness of his trial.

■ Petitioner next argues that the trial court erred by refusing to approve funds for a mass media expert to assist counsel in demonstrating that a change of venue was necessary because the jury pool had been tainted by pre-trial publicity. That argument lacks merit. The trial court conducted a thorough investigation into the amount of exposure potential jurors had had to the case, and correctly determined that a change of venue was not necessary. Petitioner has not demonstrated any way in which a mass media expert would have affected the accuracy or fairness of his trial.

■ Finally, Petitioner argues that the trial court erred by refusing to approve funds for a forensic psychologist or mitigation specialist to develop mental health defenses and themes for mitigation during the penalty phase. That argument lacks merit. First, the trial court was not required to appoint a mitigation expert in the context of this case. *Ake* requires a court to appoint a mental health expert at the sentencing phase of a capital trial only if the prosecution introduces evidence that the defendant poses a continuing threat, and the mental health expert's testimony is needed to rebut that evidence. *Clayton v. Gibson,* 199 F.3d 1162, 1175 (10th Cir. 1999); *Ramdass v. Angelone,* 187 F.3d 396, 409 (4th Cir.1999); *White v. Johnson,* 153 F.3d 197, 203–04 (5th Cir.1998); *Bannister v. Armontrout,* 4 F.3d 1434, 1441, 1442 n. 10 (8th Cir.1993). In this case, the state did not present any evidence of Petitioner's future dangerousness. Therefore,

the court's denial of a mental health expert at the sentencing phase would not constitute an *Ake* violation.

■ Second, the trial court did, in fact, approve funds for a psychiatric evaluation of Petitioner, even though one was not constitutionally required. Petitioner complains that the trial court did not approve funds for the appointment of a mental health specialist of Petitioner's choice, but the constitution does not give an indigent defendant "the right to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Ake,* 470 U.S. at 83, 105 S.Ct. 1087. All that is required is that the state provide the defendant with access to a competent psychiatrist.

In this case, Petitioner's two appointed attorneys and an appointed investigator had access to a plethora of information concerning Petitioner's background and mental state. Petitioner was evaluated by a psychiatrist, Dr. Joseph Spare, who provided a five-page psychiatric evaluation and an MMPI evaluation, and testified on a video deposition that Petitioner would be unlikely to be a repeat offender. The mental evaluation produced the information that Petitioner has a verbal I.Q. of 81, a performance I.Q. of 89, and a full scale I.Q. of 83. Petitioner's counsel and investigator had access to academic records provided by Harding High School and the Marion City School System, which records contained the information that Petitioner was a chronic truant, with poor grades, and that his schooling was interrupted for three six-month placements in Ohio Youth Commission facilities. Petitioner's counsel and investigator had access to Marion County Children Services Board records which indicated that Petitioner was physically abused by his parents.

Petitioner's counsel and investigator also had access to records provided by the Marion County Sheriff's Department, Ohio Adult Parole Authority, and Ohio Department of Rehabilitation and Corrections, which indicated an extensive history of

criminal convictions and parole violations. The record before this Court does not contain a complete listing of Petitioner's criminal history. The record does indicate, however, the following:

- A burglary conviction in 1984
- A drug trafficking charge in 1991
- Other unspecified drug offenses
- Multiple unspecified parole violations
- Brandishing a gun with an ex-girlfriend on July 7, 1991
- Rape committed on October 7, 1992
- Resisting arrest on November 24, 1992
- Burglary on January 18, 1994
- Petitioner was incarcerated for all but nineteen months of the ten years between his 1984 burglary conviction and the time of the murder trial. He was never released for longer than nine months without violating his parole.

■ At trial, Petitioner and his counsel made a strategic decision not to present any mitigation evidence arising out of Petitioner's background, because the presentation of such evidence would have opened the door to the prosecution to rebut that evidence by proving that Petitioner had a significant history of violent criminal conduct, including prior rape and firearms offenses.

Petitioner now challenges that decision, and argues that his counsel failed to conduct an adequate social history. Petitioner has provided additional information about his personal background along with his petition for habeas corpus. Since the record before this Court does not contain all of the records made available to his trial counsel, it is unclear how much of the following information trial counsel would have known. Petitioner has provided that he was born into a home characterized by drug and alcohol abuse, and physical violence. His father beat both his mother and him on a regular basis. Petitioner began pilfering from his parents' marijuana stash in third or fourth grade, and began dealing drugs in sixth grade. During that period, Petitioner's father was incarcerated for drug dealing. As an adolescent, Petitioner frequently ran away from home for days at a time.

Petitioner's wife, whom he married in 1991, has provided an affidavit stating that Petitioner was a thoughtful husband and was never violent to her.

On this record, Petitioner's counsels' decision not to present mitigation evidence was objectively reasonable. His significant criminal history far outweighed any possible mitigating effects of his unfortunate childhood. None of the suggested mitigating evidence reduces Petitioner's culpability for the murder or the unrelated string of violence that preceded it. *See Scott*, 209 F.3d 854, 879. Nor has Petitioner demonstrated that a forensic psychologist or mitigation specialist would have uncovered any evidence that would likely have produced a different outcome at trial.

Petitioner's first challenge to his conviction and sentence is meritless. No evidentiary hearing is warranted.

### 2. *Race Discrimination*

In claim number ten, Petitioner asserts he was denied his right to a fair trial because his trial was infested with racial discrimination. Petitioner has also moved for an evidentiary hearing on this claim.

The Court has already rejected most of Petitioner's race discrimination claims in its previous discussion of Petitioner's claims numbered eight, twelve, and twenty-one. The Court rejects those claims for the reasons previously given.

■ In addition to those claims, Petitioner argues that Ohio's death penalty system is inherently racially biased, because African–Americans are disproportionately represented on Ohio's death row, and sixty percent of African–Americans on Ohio's death row are there for having killed white persons. That argument lacks any merit. The Supreme Court has expressly rejected the argument that the disproportionate representation of a par-

ticular race on death row gives rise to a presumption of race discrimination in any given case. *McCleskey v. Kemp,* 481 U.S. 279, 292–97, 107 S.Ct. 1756, 1767–70, 95 L.Ed.2d 262 (1987). Nor does a showing that murderers of white victims are disproportionately likely to receive the death penalty give rise to such a presumption. *Id.*

Petitioner's tenth challenge to his conviction and sentence is meritless. No evidentiary hearing is warranted.

### 3. *Admission of Photographs of Victim*

■■■■■ In claim number fourteen, Petitioner claims that he was denied due process because of the admission into evidence of inflammatory color photographs of the murder victim. He claims that the prejudicial impact of those photographs outweighed their probative value. That argument lacks merit. The trial court has discretion to admit a relevant photograph unless it is so gruesome or inflammatory that its prejudicial impact substantially outweighs its probative value. *United States v. Ingle,* 157 F.3d 1147, 1153 (8th Cir.1998); *United States v. Sides,* 944 F.2d 1554, 1562–63 (10th Cir.1991). The eight 3–1/4 × 5″ photographs challenged by Petitioner in this case were relevant not only to show how the victim died, but also to corroborate the testimony of the law enforcement personnel who testified, to illustrate the officers' testimony which described the crime scene and the location and condition of the victim's body, to show the nature and extent of the injuries to the victim, and to assist the jury in understanding the testimony of the medical examiner. These are all legitimate purposes for which victim photographs are routinely admitted. *See, e.g., Woods v. Johnson,* 75 F.3d 1017, 1039 (5th Cir.1996). The trial court did not abuse its discretion by admitting the crime scene and autopsy photographs.

Petitioner's tenth challenge to his conviction and sentence is meritless.

### 4. *Admission of Transcripts of Police Interview*

■■■■ In claim number fifteen, Petitioner claims that the jury was provided with transcripts of statements Petitioner made to the police, which statements were transcribed in such a manner as to suggest racial stereotypes. Specifically, Petitioner objects to the use of transcriptions that preserved his nonstandard English phonology, such as "wadn't" for "wasn't" and "truf" for "truth."

Petitioner did not object to the transcripts at trial. Thus, the claim is procedurally defaulted unless Petitioner can establish cause and prejudice, *i.e.,* that his counsel's failure to object to the transcripts was so glaringly deficient that it amounted to ineffective assistance of counsel, and whether he has shown prejudice attributable thereto. If Petitioner cannot show cause and prejudice, his claim is procedurally defaulted.

Petitioner has not made the necessary showing. Although Petitioner styles this claim as an objection to "inaccurate" transcripts, his real objection to the transcripts seems to be that those transcripts are *too* accurate. Petitioner does not deny that he used nonstandard African–American English throughout the two transcribed interviews, and that the transcript reflects his speech faithfully. In fact, Petitioner has not identified a single phonetically inaccurate rendering of his speech in the entire transcription.

Petitioner complains that a jury reading the transcripts would be led to believe that they were reading "Uncle Remus" tales, thereby creating an atmosphere of racial prejudice. That complaint lacks merit. The jury heard Petitioner speak, both at the trial and in the taped interviews; they were familiar with his style of speech. There were no material differences between the tapes and the transcripts. This Court is aware of no case in which the admission of an *accurate* transcription of a recorded statement was held to be error

on that ground, and will not so hold in this case.

Nor did the trial court err by allowing the jury to take the transcripts with them into the jury room. The jury was properly instructed that the transcripts were merely an aid to facilitate listening to the tapes.

Petitioner's fifteenth challenge to his conviction and sentence is meritless.

### 5. *Refusal to Admit "Bad Acts" Evidence of Victim's Husband*

In claim number sixteen, Petitioner claims that the trial court inappropriately prevented him from presenting evidence that the victim's husband had a history of violence in order to show that the murder had, in fact, been committed by the victim's husband.

At trial, Petitioner's theory of the case was that the victim's husband, Chris Dennis, had murdered the victim, either (a) in a jealous rage after learning that Petitioner and the victim were having an affair or (b) in order to gain the proceeds of her life insurance policy. Petitioner proffered, and was allowed to present, evidence of Chris Dennis' heavy drinking and his violent tendencies, including two incidents of wife-beating. Petitioner presented evidence that Chris Dennis had threatened to kill his wife on the day she disappeared. Petitioner also presented evidence about the victim's life insurance policy.

The trial court did not admit all of the evidence Petitioner proffered. The trial court refused to admit evidence that Chris Dennis had previously committed physical assaults on Chris Lyons, Ben Audin, and Annette Dennis. The proffered evidence was excluded on the basis of Ohio Rule of Evidence 404(B), which provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."

Petitioner does not dispute that the plain language of Rule 404(B) mandates the exclusion of the proffered evidence.

He argues, however, that the evidence should have been admitted because Chris Dennis was not on trial. That argument lacks merit. The evidence rule states that "bad acts" evidence is "not admissible to prove the character of *a person* in order to show that he acted in conformity therewith." (Emphasis added.) The rule's application is not limited to criminal defendants, to victims or witnesses, or to any other subcategory of persons. It applies to all persons. The evidence was properly excluded.

Petitioner's sixteenth challenge to his conviction and sentence is meritless.

### 6. *Prosecutorial Misconduct*

In claim number seventeen, Petitioner claims that the prosecutor engaged in prosecutorial misconduct during cross-examination of Petitioner and during closing arguments both at the guilt phase and the sentencing phase of the trial, and that the trial court improperly failed to give a curative instruction. Petitioner *did not object* to the prosecutor's conduct at trial. Thus, the claim is procedurally defaulted unless Petitioner can establish cause and prejudice, *i.e.*, that his counsel's failure object to the prosecutor's conduct was so glaringly deficient that it amounted to ineffective assistance of counsel, and whether he has shown prejudice attributable thereto. If Petitioner cannot show cause and prejudice, his claim is procedurally defaulted. Petitioner has identified several sections of the trial transcript which, he argues, demonstrate prosecutorial misconduct.

First, Petitioner objects to a portion of Petitioner's cross-examination that addressed the DNA evidence presented in the case. When Petitioner was first questioned by the police, he stated that he had met Robin Dennis only on a few occasions, and only when she was with her husband. He adamantly denied having sexual relations with her. During the State's case in chief, the Prosecutor cross-examined the DNA expert in detail on the accuracy of

the DNA testing, which testing demonstrated conclusively that Petitioner's semen was in the victim's vagina and on her panties. When Petitioner took the stand, he testified that he had engaged in consensual sexual relations with the victim on the morning of the day she died. The prosecutor cross-examined him about that testimony as follows:

> Q: You were on for three hours, and the most important piece of evidence that ties uniquely Maurice Mason to Robin Dennis' raped and murdered body, you just spent thirty seconds saying, "Yeah, I had consensual intercourse with her at Ricky McDuffie's house at 10:30 a.m. on the eighth." That was your entire testimony about that, wasn't it?
>
> A: Yeah, I think it was.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Q: Well, let me ask you this. Why is it when this case started, you were denying having sexual intercourse with Robin Dennis?
>
> A: I'm married. She's married.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Q: And so that's the reason that you told Deputy Potts that, "I didn't even know Robin. I was never alone with her." Is that the reason you told him that?
>
> A: Like I said, we was having an affair. And yes, that's what I told him.
>
> Q: Is that the reason?
>
> A: Yeah. I'm married, and she's married. I mean—
>
> Q: Is that the same reason that when this case started, in order to contest the DNA results, you had your attorneys do independent DNA testing to see if our DNA results were right?

(Tr. at 3654–56.) Petitioner claims that the question regarding DNA testing both constitutes an inappropriate attack on Petitioner's defense strategy, and violates his Fifth Amendment privilege against self-incrimination because it is a comment on Petitioner's decision to exercise his constitutional rights.

■ That argument lacks merit. Although a prosecutor may not comment on a criminal defendant's decision not to testify in a way that invites an inference of guilt, once the defendant does take the stand, his testimony may be assailed and his credibility impeached the same as any other witness. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965); *accord Portuondo v. Agard*, — U.S. —, —–—, 120 S.Ct. 1119, 1124–25, 146 L.Ed.2d 47 (2000). That is what happened in this case. It was not improper for the prosecutor to point out that Petitioner had changed his story between his initial interviews with the police and the time of trial. It was not improper for the prosecutor to point out that Petitioner had failed to present any challenge at trial to the state's determination that the semen in dispute was Petitioner's. Petitioner's trial counsel's failure to object to the question about DNA testing did not rise to the level of ineffective assistance of counsel, and the objection is therefore procedurally defaulted.

■ Next, Petitioner objects to a portion of Petitioner's cross-examination that addressed Petitioner's claim, which he made for the first time on direct examination, that he had met the victim for the first time while working at the Popcorn Festival on September 11, and had become sexually involved with her that night. Petitioner also stated that he had returned to the Popcorn Festival at 8:00 the next morning. The prosecutor cross-examined him about that testimony as follows:

> Q: So you're with her continuously, let's say, from what, 2:00 a.m. to 8:00 a.m.? I mean is that—
>
> A: Somewhere around up in there, yeah.
>
> Q: And then you have to go back to the Popcorn Festival to recommence your duties there?

A: Correct.

\* \* \* \* \* \*

Q: Oh, so somebody would have some records then if you're on a clock?

A: Yeah, sure.

Q: Did you happen to bring those with you, or your attorney search those?

A: How was I supposed to get 'em? I have been locked up for the last seventeen months.

Q: Geez, you have got all these other records here.

A: I didn't bring none of those records, sir.

Q: You didn't ask your attorney to get those, either, then?

(Tr. at 6376–77.) Petitioner claims that the Prosecutor's questions concerning the lack of records was improper because it ridiculed the defense's theory. That argument lacks merit. It was not improper for the Prosecutor to impeach Petitioner by demonstrating that he had failed to present documentary evidence that should have been readily available to corroborate his claim. *United States v. Clark*, 982 F.2d 965, 968 (6th Cir.1993). Petitioner's trial counsel's failure to object to the question about work records from the Popcorn Festival did not rise to the level of ineffective assistance of counsel, and the objection is therefore procedurally defaulted.

■ Next, Petitioner objects to several portions of the Prosecutor's guilt-phase closing arguments, in which the Prosecutor (a) described the defense's theory of the case as "preposterous;" (b) suggested that Petitioner had changed his story about a having preexisting sexual relationship with the victim only in response to the strength of the DNA evidence presented by the prosecution; and (c) suggested that the defense was trying to take them "far afield" and to "cloud the issues." None of those statements constitutes prosecutorial misconduct, as long as they can reasonably be inferred from the evidence presented at trial. It is not improper for a prosecuting attorney to point out discrepancies between the accused's pretrial statements and the statements he makes at trial. Nor is the use of the word "preposterous" unduly inflammatory. *United States v. Francis*, 170 F.3d 546, 551 (6th Cir.1999) (not improper for prosecutor to assert that defendant is lying); *United States v. Shoff*, 151 F.3d 889, 893 (8th Cir.1998) (not improper for prosecutor to call defendant a "con man" and "liar"); *Williams v. Borg*, 139 F.3d 737, 744–45 (9th Cir.1998) (not improper for prosecutor to call defendant "stupid" and to refer to defense counsel's argument as "trash"); *United States v. Reliford*, 58 F.3d 247, 250 (6th Cir.1995) (not improper for prosecutor to characterize defendant's testimony as "unbelievable," "ridiculous," and "a fairy tale"); *United States v. Davis*, 15 F.3d 1393, 1402–03 (7th Cir.1994) (not improper for prosecutor to refer to defendant's case as "trash," "hogwash," and "garbage"); *compare Kellogg v. Skon*, 176 F.3d 447, 451–52 (8th Cir.1999) (improper for prosecutor to call defendant "monster," "sexual deviant," and "liar," but no prejudice shown where weight of evidence against defendant was heavy); *United States v. Collins*, 78 F.3d 1021, 1039–40 (6th Cir.1996) (improper for prosecutor to state that defense counsel deserved an Academy Award for keeping a straight face when he made his arguments, but no prejudice shown where weight of evidence against defendant was heavy). Petitioner's trial counsel's failure to object to those portions of closing argument did not rise to the level of ineffective assistance of counsel, and the objection is therefore procedurally defaulted.

■ Next, Petitioner claims that the Prosecutor engaged in improper "vouching" on two separate occasions during guilt-phase closing argument. Improper vouching occurs when an attorney supports or attacks the credibility of a witness by indicating a personal belief or disbelief in the witness's credibility. Usually, vouching involves either blunt assertions (i.e., "I believe the witness is honest"), or comments that imply that the

attorney has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses. *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999). Vouching is improper because it invades the province of the jury by inviting them to convict the defendant on a basis other than a neutral independent assessment of the record proof. *Caldwell v. Russell*, 181 F.3d 731, 737–38 (6th Cir. 1999).

■ First, Petitioner complains about the Prosecutor's description of the testimony of defense witnesses Troy and Shannon Elliot, which was as follows:

Now, the Defendant over there knew that, "Gee, this is a little bit of a problem," you know, "that I don't have any corroboration of [a consensual sexual relationship with Robin Dennis]."

And so who do they trot into this court to try to corroborate this ongoing relationship, but the husband/wife duo of Troy and Shannon Elliott.

I would suggest to you that Troy, if we have a category here for who is the most unbelievable witness, and there is a lot of candidates in this case, Troy and Shannon Elliott are at least nominees for the finalists in that category.

Troy Elliott sits up here on this witness stand, and he's questioned by Mr. Coulter, and he says, "Yeah, there were two times that I saw the Defendant and this Robin girl together. Once at Taco Bell, and once driving around town . . . ."

And then, you know, I get to question him. . . . "Did you know Robin Dennis?"

"No."

"Had you ever met Robin Dennis before?"

"No."

"How do you know it was Robin Dennis?"

"Oh, I don't know that. It was a blonde-haired girl is all I can say."

"Well, why are you referring to her as this Robin girl?

"Well, that's what Mr. Coulter said."

And then I said, "Well, okay, Well, how do you know that it was them?"

"Well, I recognized the car."

"Well, when did you—how did you recognize the car?"

"Because after she came up missing, I saw a picture of the car in the Marion Star."

\*　　\*　　\*　　\*　　\*　　\*

That would strain credibility even if there really had been a picture of the car in the Marion Star. But you know the truth, because we brought the Assistant Editor of the Star into court who said, "No, we have never put a picture of the Marion Star—a picture of that car in the Marion Star."

Where do they come up with these people? Well, you know that the common thread is? Troy Elliott's known this Defendant for sixteen years. And so who follows him into court right after Troy? His wife, Shannon.

\*　　\*　　\*　　\*　　\*　　\*

[Shannon Elliott stated that she had seen Robin Dennis with Petitioner and recognized Dennis from playing softball with her ten years earlier.]

"How old was Robin?"

"She was nine or ten."

"Had you seen Robin since the softball games in 1983."

"No."

\*　　\*　　\*　　\*　　\*　　\*

How in good conscience can the same defense team which brings in an expert witness on eyewitness identification, who wants to criticize the statements that Mr. Forester and Mr. Lautenslager made and recorded within two days, how can they in good conscience believe these witnesses are testifying to things they think they saw long ago? Recognitions based on seeing someone when they're nine years old?

Sometimes it's a measure of how weak and how preposterous the Defendant's case is, based on how far afield they try to take you with their arguments."

(Tr. at 3943–49.) Petitioner claims that the Prosecutor both improperly expressed an opinion on Troy and Shannon Elliotts' veracity, and improperly attacked defense counsel's strategy in presenting the Elliotts.

That argument lacks merit. The Prosecutor did not at any time improperly "vouch" for Troy or Shannon Elliott by stating that he, personally, did not believe them. Rather, he merely stated that their testimony was not credible. The distinction is important. It is not improper for counsel to state during closing argument that the testimony of a particular witness is not credible, particularly where, as here, counsel backs up his statement with numerous specific citations to the record. Petitioner's trial counsel's failure to object to that portion of closing argument did not rise to the level of ineffective assistance of counsel, and the objection is therefore procedurally defaulted.

■■■■ Petitioner also complains that the Prosecutor improperly vouched for the police during the rebuttal phase of closing argument, by stating that he was:

a little disturbed by how—I think the Officers in this case have been unfairly attacked and criticized. You know, I will take the criticism. I will take the attacks on myself. That's fine. But these Officers go out there, risk their lives, serve the public, and in this case I think did an outstanding job.

(Tr. at 4131.) The Ohio Supreme Court found that the Prosecutor did improperly vouch for the police, but that prejudicial error did not result therefrom, "particularly in light of defense counsel's repeated criticism of the police investigation. Where a prosecutorial statement not supported by admitted evidence is short, oblique, and justified as a reply to defense arguments and elicits no contemporaneous objection, there is no prejudicial error." *Mason*, 82 Ohio St.3d at 162, 694 N.E.2d at 952.

■■■■ Federal courts in the Sixth Circuit analyze claims of improper prosecutorial vouching during closing argument according to the test set forth in *United States v. Carroll*, 26 F.3d 1380, 1384–90 (6th Cir. 1994). First, the Court must determine whether the conduct was improper. In this case, the Prosecutor stated that the investigating officers "did an outstanding job," but lacked evidentiary support therefor. The statement was improper.

■■■■ Having determined that the statement was improper, the Court next must determine whether the conduct was flagrant. In making that determination, the Court considers: (1) whether the comments would tend to mislead the jury or prejudice the defendant; (2) whether the comments were isolated or extensive, and (3) whether the comments were made deliberately. 26 F.3d at 1385. Vouching is less likely to mislead the jury or prejudice the defendant when the prosecutor's comments were invited by defense counsel's argument. *United States v. Collins*, 78 F.3d 1021, 1039–40 (6th Cir.1996).

■■■■ In this case, the Prosecutor's improper comment was made as a direct response to argument by defense counsel; thus, it was unlikely to mislead the jury. The comment was isolated—a single improper comment in a month-long trial. There is no evidence that the comment was made deliberately to influence the jurors' deliberations. Accordingly, the Court finds that counsel's conduct was not flagrant.

■■■■ Where the improper conduct was not flagrant, a finding of prejudicial error is warranted only where: (1) the proof against the defendant was not overwhelming; (2) opposing counsel objected to the conduct; and (3) the trial court failed to give a curative instruction. *Carroll*, 26 F.3d at 1384–90. Petitioner has not demonstrated prejudicial error in this case.

First, the proof against Petitioner at trial was overwhelming. The evidence taken from the crime scene, including the victim's position, bruises, and lack of clothing, along with the semen in the victim's vagina and panties, established that she had been raped and murdered. DNA evidence established conclusively that the victim had had sexual relations with Petitioner, and with no one else, within twelve hours of her death. Several eyewitnesses saw an individual matching Petitioner's description at the crime scene near the time of the murder. Second, no contemporaneous objection was made to the Prosecutor's argument. The Prosecutor's improper vouching for the investigative officers does not warrant reversal.

Next, Petitioner complains that the Prosecutor argued with defense counsel during the examination of Deputy Lautenschlanger, Detective Potts, Chris Dennis, and during the defense case, on repeated occasions. The Court has reviewed every alleged instance of impropriety. The vast majority of the instances cited by Petitioner involve routine evidentiary objections, properly made, which were usually resolved in the state's favor. Many of the transcript pages Petitioner cites in support of his contention contain nothing but unobjected trial testimony. None of the pages cited by Petitioner evince even marginally improper conduct on the part of the Prosecutor. Petitioner claims that the trial court cautioned both counsel twice, at pages 2653 and 3789; the record does not support that factual contention.

To the contrary, the trial court expressly stated that the Prosecutor had behaved professionally during the trial. At one point during the prosecution's case in chief, *out of the presence and hearing of the jury,* the trial judge chastised defense counsel for complaining about the Prosecutor's conduct:

> The Prosecuting Attorney, in my opinion, has never, at any time in this entire case, acted in anything but in a proper manner and as a Prosecuting Attorney

should act in representing the State in this case.

> The times that you [defense counsel] have continued to get up and accuse him of untoward decorum in this courtroom is not correct. I have never seen him, at any time—those statements are you are an attempt to make a record in this case, and this Court's going to do anything that he can to protect that record. That there was never, at any time, where the Prosecutor has acted otherwise than in a proper manner.

> \* \* \* \* \* \*

> This Court was a trial attorney for thirty years before taking the bench, and I have been on this bench for twelve years. This is the third aggravated murder case. I have had countless other murder cases before me. Many, many felony cases that have been tried in this courtroom, and there is a lot that goes on in the heat of battle between attorneys. And you should recognize that.

> But Mr. Slagle's not making any sly remarks or making anything other than saving his objections, which I have to rule on as to whether they're proper or improper, the same as your objections.

> Now, I want you to get on with this case. And as I stated, that you're going to be given as much leeway as I can. But I'm not going to tolerate you saying that the Prosecutor is getting away with this and getting away with that. I don't permit that, and—and I want the record to show that there hasn't been anything, in my opinion, in the way of misconduct, or I would have corralled him long ago in this case.

(Tr. at 2788–91.) Petitioner's complaints about the Prosecutor's conduct during the evidentiary portion of the case lacks merit.

Next, Petitioner objects to several portions of the Prosecutor's sentencing-phase closing arguments. Petitioner first argues that several of the Prosecutor's statements constitute improper vouching, to-wit:

"what I think we will prove during this stage of the proceedings is that the defense really has no substantial mitigating evidence," (tr. at 4235), and "I think, having heard the evidence they presented, I think you would agree that, and I expect you will agree, that there really wasn't any substantial mitigating evidence," (tr. at 4300). That argument lacks merit. The Prosecutor was merely commenting on possible inferences from the evidence. It is not improper for counsel to comment on the weight of the evidence presented by the opposing side.

Petitioner argues that the Prosecutor's statement: "I would like to discuss with you in a little detail ... how you should go through this weighing process," (tr. at 4300), improperly invited the jury to rely on his personal experience as to how they should carry out their jobs as jurors in analyzing the evidence. That argument lacks merit. The Prosecutor's comment was not improper. At no time during the penalty-phase closing arguments did the Prosecutor identify any consideration that was not fairly supported by both the law and the evidence.

Petitioner argues that the Prosecutor improperly described the defense's evidence as "farfetched." (Tr. at 4337.) As discussed above, that characterization of Defendant's arguments was not improper.

■ Petitioner argues that the Prosecutor improperly commented on his decision to exercise his right to make an unsworn statement by stating: "The only other evidence that came forth today on guilt or innocence was the Defendant stood up here, or sat here on an unsworn statement, a statement which isn't under oath, a statement which I'm not allowed to cross-examine about, and said, 'I didn't commit this crime.'" (Tr. at 4312.) It is not improper for a prosecutor to point out that an unsworn statement by an accused was not made under oath and was not subject to cross-examination. *Byrd v. Collins,* 209 F.3d 486, 533 (6th Cir.2000); *Porter v. Estelle,* 709 F.2d 944, 959 (5th Cir.1983); *Bontempo v. Fenton,* 692 F.2d 954, 959 (3d Cir.1982).

Petitioner argues that the Prosecutor misled the jury by suggesting that the murder itself was an aggravating circumstance that would allow imposition of the death penalty. That contention is factually inaccurate. The Prosecutor made clear during closing argument that the aggravating circumstance was murder "in the course of a rape." (Tr. at 4340.) That was a correct statement of the law as applied to this case.

Petitioner argues that the Prosecutor misled the jury by suggesting that the mitigating factors Petitioner offered during the sentencing phase—i.e., good behavior in jail, artistic ability, and the pleas of Petitioner's relatives—were not sufficient to outweigh the aggravating circumstance. That argument fails. It is not improper for a Prosecutor to argue that mitigating factors offered by a capital defendant are of little merit.

Petitioner complains that the Prosecutor suggested that the jury "compare" the aggravating circumstances against the mitigating factors in determining whether to impose the death penalty. The controlling statute specifies that the death penalty will be imposed if the jury finds that "the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors." Ohio Rev.Code § 2929.03(D)(2). The only way to determine whether the aggravating circumstances outweigh the mitigating factors is to compare them. For the prosecutor to have done so was proper.

Petitioner's seventeenth challenge to his conviction and sentence is meritless.

### 7. *Sufficiency of the Evidence*

■ In claim number nineteen, Petitioner claims that the state did not prove the aggravating circumstance of rape beyond a reasonable doubt because there was no evidence of genital trauma. That argument lacks merit. The medical expert

testimony was that genital trauma is the exception, rather than the rule, in the rape of an adult woman. (Tr. at 1551–52, 3387.) There was a plethora of other evidence from which a jury could reasonably determine that the victim had been raped.

■ Petitioner does not deny that there was sufficient evidence of sexual penetration. There was also significant evidence that the sexual contact was not consensual. There was evidence of a struggle in and around Dennis' car. When Dennis' body was found, her jeans and panties were positioned around her ankles and lower leg, inside out, as though they had been removed in a forcible struggle. Dennis had been strangled. There were bruises on Dennis' head, face and body. That constitutes sufficient evidence to establish, and for the jury to find, the aggravating circumstance of rape beyond a reasonable doubt.

Petitioner's nineteenth challenge to his conviction and sentence is meritless.

### D. Claims Arising out of Sentencing

#### 1. Facial Challenges to Constitutionality of Ohio's Death Penalty Statute

In claims number five, six, seven, eight, twenty-three, and twenty-five, Petitioner raises various facial challenges to the constitutionality of Ohio's death penalty scheme. He has moved for an evidentiary hearing on his sixth claim, which is that death by electrocution constitutes cruel and unusual punishment. Petitioner's claims lack merit. The constitutionality of Ohio's death penalty scheme has recently been upheld by the Sixth Circuit. Scott, 209 F.3d 854, 2000 WL 390525, at *29; Byrd v. Collins, 209 F.3d 486, 538 (6th Cir.2000).

Nor is an evidentiary hearing required on Petitioner's claim that electrocution constitutes cruel and unusual punishment. The statute gives Petitioner the option of choosing lethal injection. Ohio Rev.Code § 2949.22(B)(1).

Petitioner's fifth, sixth, seventh, eighth, twenty-third, and twenty-fifth challenges to his conviction and sentence are meritless.

#### 2. Challenge to Constitutionality of Ohio's Death Penalty Statute as Applied

■ In claim number twenty-three, Petitioner also claims that imposition of the death penalty in this case is so disproportionate to the offense as to violate the Eighth Amendment, and asks for an evidentiary hearing on that claim. That argument lacks merit. Petitioner is guilty of a vile, heinous crime, with an aggravating circumstance that American courts have always found sufficient to justify imposition of the death penalty. Petitioner presented no substantial mitigating evidence at the sentencing phase. Nor does it appear that any significant mitigating factors exist in his case, whether presented at trial or not. There is nothing disproportionate about the penalty imposed in this case, given the nature of the crime which the jury found Petitioner committed.

Petitioner's twenty-third challenge to his conviction and sentence is meritless. No evidentiary hearing is warranted.

### E. Claim Arising out of Appeal

In claim number four, Petitioner asserts that the Ohio Supreme Court erred by deferring to the jury and trial court's determination that the death penalty was proper in this case. That argument lacks merit. The Ohio Supreme Court conducted a detailed review of Petitioner's claims, ultimately producing a detailed and thorough opinion in which they addressed each of Petitioner's claims on the merits. The Ohio Supreme Court also conducted a proper proportionality review of Petitioner's sentence, although such review is not constitutionally required. Pulley v. Harris, 465 U.S. 37, 50–51, 104 S.Ct. 871, 879–80, 79 L.Ed.2d 29 (1984); McQueen v. Scroggy, 99 F.3d 1302, 1333–34 (6th Cir. 1996).

Petitioner's fourth challenge to his conviction and sentence is meritless.

### F. Claims of Ineffective Assistance of Counsel

In claim number two, Petitioner produces a forty-one page, shotgun-style listing of errors he claims were committed by his counsel at trial and on appeal. He has also moved for an evidentiary hearing on his claims.

In order to make out a claim of ineffective assistance of counsel, Petitioner must meet the two-part test set out in *Strickland v. Washington*, 466 U.S. 668, 687–97, 104 S.Ct. 2052, 2064–70, 80 L.Ed.2d 674 (1984). First, Petitioner must show that his attorneys' performance was so far below the range of competence demanded of attorneys in criminal cases that they were not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, he must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. There is a strong presumption that counsel's performance falls within the "wide range of professional assistance." *Id.* at 689, 104 S. Ct. at 2065; *see also Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986). Most of the arguments Petitioner raises in claim number two appear as allegations of trial error in other sections of his petition. Nonetheless, the Court will address those claims in this section as well.

First, Petitioner claims that his trial counsel provided ineffective assistance by failing adequately to make the need clear for the appointment of a soil expert, shoe print expert, DNA expert, blood analysis expert, eyewitness identification expert, homicide investigation protocol expert, mass media expert, mitigation specialist, forensic psychologist. That argument lacks merit. As discussed above, the appointment of those experts was not necessary for the presentation of Petitioner's case.

Next, Petitioner claims that his trial counsel provided ineffective assistance by failing adequately to present evidence that Petitioner's wife was unable voluntarily to consent to a search of their home, thereby enabling the trial court to overrule his motion to suppress evidence obtained during that search. That argument lacks merit. All of the record evidence indicates that Petitioner's wife was competent to consent to a search, and Petitioner suggests the existence of no evidence that would indicate otherwise.

Next, Petitioner claims that his trial counsel provided ineffective assistance by failing adequately to prepare his motion to suppress the statements he made to law enforcement officers during interviews that occurred on February 10 and 12, 1993. That argument lacks merit. As discussed above, it was proper for the trial court to admit those statements.

Next, Petitioner claims that his trial counsel were unable adequately to prepare and present his case because the trial court improperly denied his counsel's request for a continuance to review 411 pages of material provided by the state eight days before the scheduled trial date. That argument lacks merit. The record indicates that Petitioner had access to all of the materials he needed to prepare for trial—approximately 3,000 pages of discovery—several months in advance of the trial date. Eight days before trial, the state erroneously forwarded 411 pages of documentation to which Petitioner was not entitled. (Tr. at 1707.) Petitioner requested a continuance to review the 411 pages, and the trial court denied the motion.

Contrary to Petitioner's assertions, Defense counsel demonstrated a thorough preparation for trial both before and during the trial of his case. Defense counsel filed 57 pretrial motions. At trial, defense counsel presented 31 witnesses and 41 defense exhibits were admitted into evidence. Defense counsel conducted a thorough and well-prepared cross-examination of each of

the 32 prosecution witnesses, most of whom had been interviewed by defense counsel before trial. Petitioner has not demonstrated that his counsel were unprepared for trial.

Next, Petitioner claims that his trial counsel provided ineffective assistance during voir dire. He alleges that his counsel improperly failed to object when the trial court dismissed, for cause, jurors who were unable to serve because of medical problems, work conflicts, or other similar reasons. That argument lacks merit. The trial court dismissed only those jurors who were legitimately unable to serve, or who expressed personal bias or an inability to follow the trial court's instructions.

Petitioner complains that his trial counsel improperly failed to object to the dismissal of jurors who expressed scruples about the death penalty. As discussed above, that objection lacks merit.

Petitioner complains that the trial court denied his request for complete sequestered voir dire. That argument lacks merit. The trial court conducted sequestered voir dire of all sensitive issues, and no evidence has been presented that anything occurred during the group voir dire that could have poisoned the jury.

Petitioner complains that his lead trial counsel was absent from a pretrial motions hearing, during which time routine court business was conducted. That argument lacks merit. Petitioner personally consented to lead counsel's absence, and co-counsel represented Petitioner effectively.

Petitioner complains that his lead trial counsel was absent for about an hour and a half of voir dire, during which time the trial court conducted the sequestered voir dire of two jurors who served on the petit jury. That argument lacks merit. Petitioner personally consented to lead counsel's absence, and co-counsel conducted an effective voir dire of the two jurors in question.

Petitioner complains that his lead trial counsel was absent for about three hours of jury deliberations, during which time the trial court gave the jury an *Allen* charge. That argument lacks merit. Petitioner personally consented to lead counsel's absence, co-counsel was present, and Petitioner has shown no way in which lead counsel's presence could have affected that portion of the trial in any way.

Petitioner claims that his trial counsel failed to examine potential jurors on general theories of defense and mitigation. That argument lacks merit. The voir dire in this case took three days, and much of the voir dire was sequestered, in accordance with Petitioner's pretrial motion therefor. During both sequestered and group voir dire, Petitioner's trial counsel examined potential jurors on theories of defense and mitigation.

Petitioner claims that his trial counsel improperly failed to object to a statement by the trial court that "placed the blame for the [jury] questionnaire and the personal questions contained there in on the defense." That argument lacks merit. The record indicates that the trial court included the following statement in his introduction to the voir dire:

I want to apologize at the outset for some of the questions that are in the questionnaire, because I'm sure some of you—you felt that that was an infringement on your right to be questioned and to have to respond as to your views to some of these questions. I recognize that. However, Courts above me have held that a Defendant is entitled to have these questions answered in order to receive a fair trial.... I can assure you that the Court and counsel have no intention of embarrassing any of the jurors by the questions they might ask.

(Tr. at 713.) There was nothing at all wrong with the trial court's statement. Indeed, the statement expressed sensitivity to jurors' possible concerns about the content of the questionnaire and, more likely than not, helped to diffuse any of-

fense or embarrassment that might have occurred.

Petitioner claims that his trial counsel questioned potential jurors ineptly and antagonistically about their feelings on race and racial discrimination. In support, he cites to two excerpts from the transcript that (1) involve sequestered voir dire of venirepersons who did not serve on the petit jury; (2) do not address race or race discrimination; and (3) are not antagonistic. Petitioner has not cited to a single instance of inept or antagonistic questioning of venirepersons about race or race discrimination. On this record, Petitioner's argument must be rejected.

Petitioner claims that his trial counsel improperly failed to rehabilitate potential jurors, including one African–American potential juror, who expressed scruples about the death penalty. That argument lacks merit. Each of the potential jurors who was dismissed for cause after stating that he or she would not be able to impose the death penalty was thoroughly questioned, and was dismissed only after it became clear that he or she would not be able to apply the law as instructed by the trial court.

Petitioner claims that his trial counsel improperly failed to question or to challenge two female jurors who were pregnant at the time of the trial. The record indicates that *one* female juror indicated during voir dire that she was pregnant. (Tr. at 1278–80.) Counsel did question the juror about whether her pregnancy would impair her impartiality, and she stated that it would not. Counsel was entitled to rely on that representation. Petitioner's argument lacks merit.

Petitioner claims that his trial counsel improperly failed to question or to challenge two female jurors who were victims of domestic violence. That argument lacks merit. Counsel did question both jurors about whether their experiences, as victims of domestic violence, would impair their impartiality, and both stated that

they would not. Counsel was entitled to rely on that representation.

■ Petitioner complains that his trial counsel were antagonistic to prospective jurors, and argued with the judge and the prosecution in front of the jurors. The Court has reviewed each of the twelve separate sections of the voir dire transcript Petitioner cites in support of his contention. Only one of those sections, (tr. at 1004–06), involve the voir dire of a juror who actually sat. The other sections either involve the sequestered voir dire of venirepersons who were ultimately discharged, or occurred out of the hearing of the jury altogether. Petitioner's voir dire of the juror who actually sat included the following exchange:

> Mr. Winkfield: You did indicate on your questionnaire that you recognized that discrimination does exist in our society?
>
> Ms. Bird: Oh, sure.
>
> Mr. Winkfield: Do you harbor any ill will against Mr. Mason or myself because we're black people?
>
> Ms. Bird: No, sir.
>
> . . . . .
>
> Mr. Winkfield: What are your views on interracial marriage and relationships?
>
> Ms. Bird: What are my views on it?
>
> Mr. Winkfield: Yes, ma'am.
>
> Ms. Bird: I have no comments on that.
>
> Mr. Winkfield: Is there a reason why you have no comments?
>
> Ms. Bird: I don't think of it one way or another.
>
> Mr. Winkfield: Okay.
>
> Ms. Bird: I don't—
>
> Mr. Winkfield: Okay. Your reason for saying no comments is not because there was something negative that you wanted to hide?
>
> Ms. Bird: No.

(Tr. at 1005–06.) There is nothing at all inappropriate about counsel's performance

during this exchange. Counsel was charged with asking potential jurors about a sensitive issue—race discrimination. He could not avoid the subject without risking a meritorious claim of ineffective assistance; indeed, Petitioner claims in many other portions of his petition for habeas corpus that his counsel should have inquired about the issue in more detail. When Juror Bird gave her "no comment" answer to counsel's initial question, that response begged for a follow-up. There was nothing discourteous or antagonistic about counsel's behavior. Petitioner's argument lacks merit.

Petitioner complains that his counsel failed to challenge jurors who indicated that they would automatically impose a sentence of death. That argument lacks factual support. Every potential juror was questioned in detail about his or her attitude towards the death penalty. Each of the twelve jurors who served stated that they would consider the case on its individual merits, and would not automatically impose a sentence of death.

■ Petitioner complains that his counsel improperly described the guilt phase of the trial as the phase in which it would be determined whether Petitioner was "guilty or innocent," rather than "guilty or not guilty," and failed to object to similar statements by the prosecution. The Court has reviewed each of the nine separate sections of the voir dire transcript Petitioner cites in support of his contention. Only two of those sections, (tr. at 786, 1001), involve the voir dire of a juror who actually sat. In the first instance, Petitioner's counsel described the first phase of the trial as the "guilt or innocence" phase. That is a correct label. In the second instance, the Prosecutor informed a juror that "[t]he first phase of the case would be to determine the Defendant's guilt or innocence. At the end of that phase, the jury would go back and deliberate and vote guilty or not guilty." Again, that is a correct statement. The Prosecutor made it clear that the jury's

determination was "guilty or not guilty." Nothing about either statement implied in any way that the jury must find the defendant "innocent" in order to acquit, particularly in light of the detailed instructions on burden of proof that the jury received at the end of the case. Petitioner's argument lacks merit.

Next, Petitioner complains that his trial counsel were unprepared to try the case, were unfamiliar with the facts of the case, and had no plan of defense or mitigation at the commencement of trial. As discussed above, that argument lacks merit. Petitioner's trial Counsel spent months preparing for his case. They presented a thorough and well-prepared defense throughout the entire trial. Petitioner argues that his trial counsel "failed to develop and present an effective theory of defense," but gives no suggestion as to what more his counsel could have done. The evidence against Petitioner was overwhelming. Petitioner's counsel zealously presented a defense of actual innocence, and proffered what evidence they could in support of that theory. Petitioner's counsel vigorously cross-examined each of the government's witnesses. If the jury did not believe that Petitioner's arguments at trial created a reasonable doubt as to his guilt, it was because there was no reasonable doubt to be found. The state established conclusively that Robin Dennis had been raped before her death. The state also established conclusively that Petitioner was the only individual who had had sexual contact with Dennis on the date of her death. Petitioner's trial counsel did the best they could do in the face of evidence that was simply impossible to rebut.

Next, Petitioner complains that his trial counsel improperly failed to obtain *Brady* material prior to the case. As discussed above, that argument lacks merit. The record shows that Petitioner actually proffered at trial every piece of *Brady* material of which he alleges he was unfairly deprived.

Next, Petitioner complains that his lead counsel consistently engaged in abusive, argumentative and inflammatory conduct in front of the jury, which led to the trial court imposing a number of sanctions on him. The Court has reviewed each of the many sections of the trial transcript Petitioner cites in support of his contention. None has supports his assertions. The bulk of the instances cited by Petitioner involve routine evidentiary objections and requests to see prosecution exhibits. Many other instances to which the Court was cited consist of nothing but routine cross-examination. Other portions of the trial transcript cited by Petitioner reflect that the exchanges occurred entirely out of the jury's presence. In the 176 pages of trial transcript that Petitioner cites, the Court has found only two instances of even marginally improper conduct. At 2209, Petitioner's lead counsel and the trial court engaged in the following exchange:

Mr. Winkfield: Your Honor, I just ask, for the record, that Mr. Slagle quit the snide remarks. I think it has a detrimental effect for the jury.

The Court: Mr. Winkfield, you're just exacerbating the entire thing. What's your objection?

At 3500, Mr. Winkfield and the Prosecutor engaged in a brief heated exchange (ten lines of transcript) outside the presence of the jury. Those two, isolated incidents probably totaling less than thirty seconds of actual time can hardly be described as consistent "abusive, argumentative and inflammatory conduct."

Petitioner claims that the Court threatened his lead trial counsel with contempt at 3787–88. Petitioner misstates the record. At the portion of the record cited by Petitioner, the trial court admonishes *spectators in the gallery* to refrain from talking; no mention is made of counsel for either side.

 Next, Petitioner claims that his trial counsel improperly introduced evidence that Petitioner was on parole, and that his parole was revoked in April, 1993 for drinking while on parole, possessing a weapon while under disability, and talking to a known felon. (Tr. at 2721, 3550.) That argument lacks merit. In the context of the case, Petitioner had two choices: (1) truthfully inform the jury that he was incarcerated for parole violations in April, 1993; or (2) risk having the jury jump to the conclusion that he was arrested for Robin Dennis' murder in April, 1993. Petitioner's counsel's strategic choice of the former did not fall below the range of competence demanded of attorneys in criminal cases.

Next, Petitioner claims that his trial counsel improperly failed to challenge the testimony of Witness Thomas Forster. That argument lacks merit. Mr. Forster never positively identified Petitioner as the man who was walking through the field immediately after the murder. Defense counsel thoroughly cross-examined Mr. Forster, and established that he was unable positively to identify Petitioner. (Tr. at 1666.) No special instruction was required.

Next, Petitioner claims that his trial counsel improperly failed to object to the introduction of government exhibit 65, a Colt .22 frontier revolver that was found in a barn near the murder scene. Petitioner claims the gun's relevance to the case was not demonstrated. Petitioner's argument lacks merit. First, Petitioner's trial counsel did, in fact, object to the introduction of the revolver. (Tr. at 1909–11, 1918–19.) Second, contrary to Petitioner's contention, the state did establish the revolver's relevance. (Tr. at 1932–35.)

Next, Petitioner claims that his trial counsel improperly failed to object to the introduction of government exhibit 30, a piece of metal consistent with a Colt single action .22 revolver, because the government's expert did not testify "to a reasonable degree of scientific certainty." That argument lacks merit. An expert witness is not required to use magic language in order for his testimony to be admissible, as

long as the basis for his opinion is solidly established. Counsel's failure to object was not improper.

Next, Petitioner claims that his trial counsel improperly failed to object to the introduction of government exhibit 33, a piece of wood with human hair, because the government's expert could not testify with certainty that the hair belonged to the victim. That argument lacks merit. Petitioner's objection goes to the weight of the witness' testimony, not to its admissibility, and the witness was subject to cross-examination. Counsel's failure to object was not improper.

Next, Petitioner claims that his trial counsel improperly failed to call Chris Dennis' mother to testify. He does not suggest the existence of even a single piece of admissible exculpatory evidence Chris Dennis' mother could have provided. (Tr. at 4275–76.) On this record, the Court cannot find Counsel's failure to call Chris Dennis' mother to be improper.

Next, Petitioner claims that his trial counsel improperly failed to object to the state's late disclosure of exculpatory evidence provided by Arthur Lewis Burchett a/k/a Lewis Marone. The record indicates that at about 10:20 on the morning of June 15, 1994, while the defense was presenting its case in chief, Burchett provided certain information about the murder to Detective Potts. Detective Potts informed the prosecution of that at 12:15 on that same date, and the Prosecutor provided defense counsel with two copies of Burchett's statement at 12:30. (Tr. at 3742–46.) In short, the government provided the defense with all the information it had about Burchett's statement within fifteen minutes of receiving that information. On this record, the disclosure cannot reasonably be described as "late."

Next, Petitioner claims that his trial counsel improperly failed to object when the Prosecutor questioned him about his refusal to provide the state with a set of fingerprints, in violation of a court order. The record indicates that Petitioner was fingerprinted on four separate occasions, but that the fingerprints were always smudged, probably because Petitioner was not holding his hands still. Thereafter, Petitioner refused to provide the state with another set of prints, despite the fact that a court had ordered him to do so. Petitioner's argument lacks merit. On these facts, it was not error for the Prosecutor to question Petitioner about his refusal to provide fingerprints, and to comment on his failure to do so. Furthermore, the record indicates that Petitioner's trial counsel did, in fact, object to the Prosecutor's questions.

■ Next, Petitioner claims that his trial counsel improperly failed to object to the testimony of prosecution investigator Vicki Robbins, who testified regarding prior inconsistent statements by defense witnesses Troy and Shannon Elliott. Petitioner claims that Robbins' testimony consisted of inadmissible hearsay. That argument lacks merit. The state did not offer the Elliotts' prior inconsistent statements for the truth of the matter asserted; the statements were offered solely to show inconsistency. Thus, those statements were not hearsay at all. Robbins' testimony was admissible. Counsel's failure to object was not improper.

Next, Petitioner claims that his trial counsel improperly failed to object to prosecutorial misconduct during closing argument. That argument lacks merit. As discussed above, no such prosecutorial misconduct occurred.

Next, Petitioner claims that his trial counsel improperly failed to object to improper jury instructions at the guilt phase. That argument lacks merit. The jury instructions were correct.

Next, Petitioner claims that his trial counsel improperly failed to insist on obtaining the results of the DNA test of Robin Dennis' fetus. He offers no suggestion as to how that evidence could have produced a different result at trial. Petitioner's argument lacks merit.

Petitioner also raises a number of objections to his trial counsel's conduct during the penalty phase of the case. First, Petitioner claims that his trial counsel improperly failed to investigate possible psychosocial mitigating factors that could have spared him the death penalty. As discussed above, that argument lacks merit. Petitioner has not suggested the existence of any mitigating factor that is not overwhelmingly negated by his history of violent criminal conduct, including a prior rape and firearms offenses, multiple parole violations, and multiple drug offenses stretching as far back as elementary school. *Cf. Scott,* 209 F.3d 854, 879. Petitioner's counsel's strategy of not presenting mitigating testimony in order to keep Petitioner's extensive criminal history from the jury was objectively reasonable. Nor has Petitioner shown prejudice; on this record, Petitioner cannot show a reasonable likelihood that any juror who was apprised of Petitioner's complete psychosocial history—including his prior criminal record—would not have voted for the death penalty. *Id.*

Next, Petitioner claims that his trial counsel improperly failed to object to the introduction of all guilt-phase evidence during the penalty phase of the case. As discussed above, that argument lacks merit. The trial-phase evidence was admissible. Furthermore, the record indicates that trial counsel *did* make a contemporaneous objection.

Next, Petitioner claims that his trial counsel improperly failed to convince the court to provide the jury instructions on residual doubt as a mitigating factor. That argument lacks merit. As discussed above, no such instruction was required.

Next, Petitioner claims that his trial counsel provided ineffective assistance because one alternate juror was dismissed after the jury returned its verdict at the guilt phase of the case, but before the commencement of the penalty phase. The Court is at a loss as to how the dismissal of the alternate juror can have affected the outcome in this case, since neither alternate juror participated in any portion of the deliberations. Petitioner's argument lacks any merit.

Next, Petitioner claims that his trial counsel improperly failed to object to the Prosecutor's "mischaracterization" of mitigating factors during his opening statement at the penalty phase. The record indicates that the Prosecutor instructed the jury: "You are allowed to consider the history, character, and background of the Defendant, and you are allowed to consider any other factors relevant to whether the Defendant should be sentenced to death." (Tr. at 4234.) That is a correct statement of the law. Counsel's failure to object was not error.

Next, Petitioner claims that his trial counsel improperly failed to object to the Prosecutor's cross-examination of Petitioner's wife, Terri Mason, about her activities on the day of the crime during the penalty phase. That argument lacks merit. Since Petitioner relied on residual doubt as a mitigating factor during the penalty phase, it was proper for the Prosecutor to ask Terri Mason questions aimed at removing that residual doubt.

Next, Petitioner claims that his trial counsel improperly failed to introduce mitigating evidence that Petitioner had saved the life of another inmate, Robert Rodeffer, who had attempted suicide. That argument lacks merit. As discussed above, Petitioner's counsel's strategy of not presenting mitigating testimony in order to keep Petitioner's extensive criminal history from the jury was objectively reasonable, and no prejudice has been shown.

Next, Petitioner claims that his trial counsel improperly failed to object to an erroneous instruction on unsworn statements. That argument lacks merit. As discussed above, it is not improper for the trial court to instruct the jury that an unsworn statement by an accused was not made under oath and was not subject to cross-examination.

Next, Petitioner claims that his trial counsel improperly failed to object to the *Allen* charge the trial court gave when the jury announced that it was deadlocked. That argument lacks merit. As discussed above, the *Allen* charge was proper.

Petitioner also complains about his trial counsel's post-trial conduct of the case. Petitioner claims that his trial counsel provided ineffective assistance by failing to convince the trial court that juror misconduct so tainted the proceedings that the verdict was unreliable. That argument lacks merit. As discussed above, no such juror misconduct occurred.

Next, Petitioner claims that his trial counsel improperly failed to object to prosecutorial misconduct. That argument lacks merit. As discussed above, no such prosecutorial misconduct occurred.

Next, Petitioner claims that his trial counsel improperly failed to object to incorrect jury instructions. That argument lacks merit. No error in the jury instructions has been shown.

Petitioner also raises certain complaints about the conduct of his appellate counsel in this case. Petitioner claims that his appellate counsel failed adequately to litigate the state's failure to disclose *Brady* material; the state's failure to provide adequate appellate and proportionality review; the constitutionality of Ohio's death penalty scheme; the trial court's denial of a change of venue; Petitioner's race discrimination claims; the denial of his motion to suppress; the death-qualification of the jury; the admission of crime-scene photographs; the admission of the transcript of Petitioner's police interviews; the exclusion of bad-acts evidence pertaining to Chris Dennis; prosecutorial misconduct; the jury instructions; the sufficiency of the evidence; juror misconduct; and his ineffective assistance of trial counsel claims. As discussed above, all of those claims lack merit.

Petitioner's seventeenth challenge to his conviction and sentence is meritless. No evidentiary hearing is warranted.

## CONCLUSION

At this point, the Court has addressed all of Petitioner's claims of error separately. The vast majority of Petitioner's claims are entirely without merit. Petitioner has, however, identified some trial errors. The Court now reviews those errors to determine if they, collectively, deprived Petitioner of a fair trial. Petitioner has raised the following meritorious points of error:

- a procedurally defaulted claim that the trial judge improperly agreed with Juror Crane's assertion that the death penalty, as currently applied, is an ineffective deterrent, made outside the presence of all jurors except Juror Crane;

- a claim that the trial court referred to "aggravating circumstances" in the plural during the penalty phase of the trial;

- a claim that some of the jurors joked about dew rags, beer runs, and Petitioner's nonstandard speech;

- a claim that Juror Downs improperly disassembled her husband's gun;

- a procedurally defaulted claim that the Prosecutor improperly vouched for the investigative officers during closing argument; and

- a procedurally defaulted claim that Petitioner's lead counsel accused the prosecutor of making " snide remarks."

Viewed together, these errors do not come close to depriving Petitioner of his right to a fair trial. No month-long trial is perfect. The issue on habeas review is not whether Petitioner received a perfect trial, but whether the trial errors rise to the level of a constitutional violation by creating a "substantial and injurious effect or influence in determining the jury's verdict." *California v. Roy*, 519 U.S. 2, 4–5,

117 S.Ct. 337, 338, 136 L.Ed.2d 266 (1996) *(quoting Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). The trial errors in this case do not begin to rise to that level.

Accordingly, the Court finds that Petitioner has not demonstrated that he was denied his right to a fair trial. Petitioner's motion for a writ of habeas corpus and corrected motion for a writ of habeas corpus are denied.

The State's motion to strike Petitioner's traverse is denied. Petitioner's motion for an evidentiary hearing is denied.

IT IS SO ORDERED.